## Case No. 7,813.

### KING OF SPAIN v. OLIVER.

[Pet. C. C. 276.] [1]

Circuit Court, D. Pennsylvania. April Term, 1816.

ACTION BY CREDITOR AGAINST DEBTOR OF HIS DEBTOR—WHETHER MAINTAINABLE.

1. Action for the recovery of the duties, payable to the crown of Spain, upon the importation of merchandize into La Vera Cruz, under royal licenses. There is no principle of law, which will sanction an action by the creditor, against the debtor of his debtor, upon the ground of contract; for there is no privity between them.

2. During the reign of Charles IV. of Spain, Hope and Company of Amsterdam negotiated a loan, for, and on his account, for the repayment of which, the revenues of Spain were pledged. Duties, which were payable to the king of Spain, on the export of merchandize to the Spanish possessions in America, came, legally, into the hands of Hope and Company, and were by them applied to the liquidation of the loan. *Held*, that these duties, were a part of the revenues of the crown of Spain, pledged for the repayment of the loan; and such an appropriation by Hope and Company, was proper.

[Cited in Wisconsin v. Pelican Ins. Co., 127 U. S. 290, 8 Sup. Ct. 1374.]

At law.

Mr. Rawle, C. J. Ingersoll, and J. R. Ingersoll, for plaintiff.

---

[1] [Reported by Richard Peters, Jr., Esq.]

Hopkinson, Binney & Sergeant, for defendants.

WASHINGTON, Circuit Justice. This is an action on the case, brought by his Catholic majesty the king of Spain, to recover from the defendants [Robert and John Oliver], the amount of duties to which the crown claims to be entitled, upon a number of shipments, made by the defendants, from the United States to La Vera Cruz, in the years 1806 and 1807, under royal licenses. The question, for the decision of the jury, is, whether the duties claimed or any other, are due and owing by these defendants. On the investigation of this question, it will be proper to consider: First, Were these duties, at any time, due by the defendants to the crown? If they were, then; secondly, have the defendants paid them to any person, legally authorized to receive them? And if not, then; thirdly, have they been received by, or so come to the use of the crown, as to disable the plaintiff from recovering in this action?

The two first questions may be considered together. It is contended on behalf of the plaintiff; that by the terms of the royal order of the 24th December, 1804, the duties accruing on shipments to the Spanish colonies in America, made under royal licenses, were to be paid by the shipper into the royal chests of consolidation in Spain; and consequently, that the defendants, having under these licenses, made the shipments, on which these duties are claimed, the law raised a contract on their part, to pay the same to the crown. For the defendants it is contended, that the privilege of making these shipments, was granted to Francis Ouvrard and Co., by the contract entered into on the 26th November, 1804, between Francis Ouvrard and Co. on the one side, and Manuel Sexto Espinosa, representing the crown on the other; by the terms of which contract, the duties which may arise on the shipments, were to be paid into the royal chests of consolidation, by the said Francis Ouvrard and Co. That the defendants derived their right to make shipments, from the said Francis Ouvrard and Co., to whom they were bound to pay the duties, and to whose agents they did pay them; consequently, the law could not raise an implied contract to pay to the crown. It will of course be necessary, to review the various transactions which preceded or were connected with the trade, which the defendants and others carried on with the Spanish colonies in 1806 and 1807, under permits granted by the crown. There can be no doubt, but that the crown was induced to tolerate this trade, so contrary to its general policy, by the approaching war with Great Britain; and that the objects were, under the cover of neutral flags, to supply their colonies with provisions, and such other articles of luxury and necessity, as they might require; to afford them an opportunity to export such of their products as they could spare; and

to replenish the royal coffers with the duties, which would accrue on this trade, as well as to bring away the precious metals, and the products of the colonies, to which the crown was entitled. To effect these objects, the contract of the 26th of November, 1804, was entered into, between Don Manuel Sexto Espinosa, on the part of the crown of Spain, and Francis Ouvrard of Bourdeaux; by which they agreed, to form a partnership, under the firm of Francis Ouvrard and Co., with a capital of eight millions of livres, to be furnished one half by Ouvrard, and the other by Espinosa, to be taken from the proceeds of the first returns from the Spanish colonies, on account of Espinosa; the partnership to continue until the end of the war with Great Britain. The contract stipulates, among other things, as follows: First. That Ouvrard and Co. shall enjoy, during the war with Great Britain, the privilege of importing from Europe, under neutral colors, into Vera Cruz, Havanna, Caracas, and Monte Video, merchandize, provisions, and other articles; and of exporting from thence, produce, and silver, and gold. Second. Espinosa, to furnish the partnership with all the necessary permissions, for the expedition of the vessels from Europe to the colonies; according to the instructions to be given by Ouvrard and Co. Third. The profits resulting from the transactions of the partnership, to be divided equally, at the expiration of it; one half on account of the consolidation of the Vales and the other of F. Ouvrard. Fourth. The import and export duties to be paid in Spain, for the merchandizes from Europe, two months after advice received of their arrival in America; and for those from America, in two months after the acknowledge of their arrival in the ports of Europe. Fifth. The accounts of the partnership to be liquidated, within a year after the war ended; and the capital and profits then to be divided. A general settlement of the affairs of the concern to be annually made. Sixth. Commercial houses, to be selected by the parties to the contract, to be established at Hamburgh and other places, on account of the partnership. This contract, by the terms of it, requiring the approbation of the king, it was afterwards submitted to him; and together with ten additional articles, made by his order, received the royal sanction in December, 1804. These additional articles, contain amongst others, the following stipulations. That Ouvrard and Co. shall have conveyed to Europe, all the colonial produce, which the king may please to export from America; the same to be delivered by the king's agents, at certain enumerated ports in America, to the correspondents of Ouvrard and Co.; who are to reserve for the same, one-third of the capacity of every vessel coming on their account to Europe; provided the king's agents shall be ready to deliver the produce, without causing delay to the vessel. A similar provision was reserved, as to articles which the king

may have to send from Europe, to certain ports in the American colonies. These articles further stipulate, what compensation is to be paid to Ouvrard and Co. for the above services, and for the sales of such articles belonging to the king, as may be so conveyed. In explanation of the eighteen articles of the original contract, of the 20th of November, in respect to the payment of the import and export duties, to be made to the king by Ouvrard and Co., it is stipulated; that payment shall be made with all exactness, and conformable to the tariff of rates regulated by the different ordinances, decrees, and orders of the king, with one exception only, that the time for the payment is to be such, as is stipulated in the eighteenth article.

The commercial neutral houses, by whose agency the contemplated trade was to be carried on, appear to have been selected according to the stipulation in the contract; and on the 24th of December, 1804, the royal order issued, which has been before alluded to, and was addressed to the viceroy, governor and intendants of the different colonies, with which the trade was to be carried on, as well as to the ministers of the crown, residing in the United States, and in other neutral nations. The material parts of this order are as follows: First. That the king has granted permission to certain enumerated neutral houses in Europe and America, to dispatch for Vera Cruz, from neutral ports in Europe and America, as many vessels with cargoes as they may think proper; and to bring back gold and silver or other productions of the colonies, to Spain, or to neutral ports in Europe and America. Second. The invoices of such cargoes, to be presented by such neutral houses to the Spanish consuls, in duplicates, and be certified by that officer; specifying therein the permits, and expressing the value of the cargo comprised in each shipment. One of these invoices, so certified, to accompany the cargo, and the other to be delivered to the Spanish minister. Third. Two months after the knowledge of the arrival of each expedition in America; the house who dispatched it, shall pay into the general treasury in Spain, and into the royal coffers of consolidation, the duties which should be exacted in Spain, for foreign merchandize; which duties are particularly enumerated. The colonial duties to be paid at La Vera Cruz, on the arrival of the merchandize there. This order was accompanied by a private letter to the officer to whom it was addressed, calculated to stimulate his exertions, to promote the king's interest, as contemplated in the order; and particularly, it required the officer, to whom it was addressed, in the colonies, to have in readiness the precious metals and produce belonging to the king, which the neutral houses, who were to be engaged in this trade, were bound to convey to Europe. The letter addressed to the minister in the United States, states the names

of the houses in the United States, to whom the privilege of this trade is permitted; and directs, that the invoices are not to be certified, unless the house shall present to him, a particular permission, according to the form annexed. In that addressed to the Spanish minister in Sweden, the privileged houses in that country are also mentioned; and it then proceeds to state, that there must be paid on account of those houses, into the general treasury, &c. the duties which should have been exacted in Spain, on the importation of the goods shipped; and even those of exportation for America; and to this end, those houses are required to present to the consuls, invoices in duplicate, expressing the value of the cargoes which they are to certify, and mentioning therein the licenses; the captain to be bearer of the one, and the other to be forwarded to the minister of finance in Spain. On the 6th of May, 1805, Ouvrard and Co., entered into a contract with Hope and Co. of Amsterdam, the object of which was, to have the above contracts with Espinosa carried into effect, through their agency. This contract is entitled "An agreement, respecting the commerce of the Spanish colonies, between Hope and Co., and Ouvrard and Co." It stipulates, amongst other things: First. That Hope and Co. shall enter upon the execution of the instructions from Ouvrard and Co., so as to insure complete success to the operations which shall be successively agreed upon, and in conformity with the stipulations which follow therein. Second. Hope and Co., are to have in the United States, an agent general, to correspond with the Spanish colonies, and charged with the direction of the cargoes to be dispatched from Europe and from the United States to those colonies, and with the shipments from the colonies, for the United States or Europe; and, in short, with all that can promote the success of those operations. Third. This agent is to have power to appoint agents under him; Ouvrard and Co. to designate the commercial houses in the colonies, who are to receive and expedite the consignments. Fourth. The agent-general, who is to be considered as the representative of Hope and Co. in person, is to receive no compensation; the same being included in the compensation of Hope and Co. Fifth. Hope and Co. to communicate to Ouvrard and Co. the advice they receive from their agents, and, in short, accounts of all their transactions.

There are strong reasons for believing, that soon after the introduction of Hope and Co., into the management of the affairs of Ouvrard and Co. they perceived and pointed out to Ouvrard and Co., the impolicy of conflicting the privilege of the colonial trade to certain specified houses; and it is by no means improbable, that these representations produced the second royal order of the 9th of August, 1805. It refers to the former order of the 24th of December, 1804, and adds that the king has resolved, that the permits for mak-

ing those expeditions shall be unlimited, and shall be considered as having been granted to any neutral commercial house, which can exhibit a permit for each expedition, similar to that before sent in virtue of the former order, and accompanying it by an invoice of the cargo, in duplicate, to be certified by the consul; the captain to be the bearer of one invoice and permit, and the other to be sent immediately to the treasury department in Spain, with an account of the name of the vessel, of the captain, and the tonnage of the vessel. It is to be observed, that nothing is said in this order, upon the subject of duties. It was addressed, like the former, to the viceroys, governors, and intendants of the colonies, and to the ministers of the crown, at Hamburg, Berlin, Copenhagen, Stockholm, and the United States. The private letter which accompanied it, addressed to the viceroys, has the following expressions: "I must remind you, that you must conform to the royal order of the 24th December, 1804, for what respects the payment of the duties." Blank licenses were now prepared by the crown, and delivered to Ouvrard and Co., who forwarded them to Hope and Co.; and Ouvrard and Co., having provided that the former should appoint a general agent, to reside in the United States, to superintend and conduct the business, relating to this trade; Mr. David Parish was selected by Hope and Co., and approved of by Ouvrard and Co.; and they obtained from the Spanish government a passport for him, as well as for another agent, who was to reside at La Vera Cruz; which they also forwarded to Hope and Co. The passport for Mr. Parish, was dated the 9th of August, 1805, and expresses, that he is going to the United States with commissions, wherein the royal service is interested; and then proceeds to direct the resident minister there, to grant to Mr. Parish, all the support he may require for his views, in order that the will of the king be punctually accomplished. Mr. Parish arrived in the United States some time in January, 1806; and immediately commenced his operations, by forwarding some expeditions himself to the Spanish colonies, and by placing in the hands of certain mercantile houses, some of the licenses which he had received from Hope and Co., to enable them to carry on the trade.

After this general view of the transactions, which followed the contract of the 26th of November, and 4th of December, between Espinosa and F. Ouvrard, the mind can with difficulty refuse its assent to the conclusion that the two royal orders, the licenses, passports and private instructions, originated in those contracts, and were intended to carry the same into execution. It is difficult, otherwise, to account for their strict correspondence with the terms of those contracts. They contain stipulations, that permits or licenses, for carrying on the export and import trade of the colonies, shall be granted by the crown,

That the precious metals and produce belonging to the king, shall be brought away, in the vessels to be employed in this trade, for which purpose, one third of the tonnage of each vessel was to be reserved: but unless the king's property should be ready to be put on board, so as to cause no delay, the owner may fill up the vessel on his own account. Accordingly, we see that blank licenses were granted; bills, to the amount of two millions of dollars, drawn by the Spanish government on the colonies, were forwarded to Hope and Co.; and letters were addressed by the minister of finance, to the viceroys, governors, and intendants of the colonies, in relation to the produce belonging to the King, and in strict conformity with the additional articles in relation to that subject. It is also to be remarked, that although neither the royal orders nor the private letters to these officers of the government, speak in direct terms of the contracts of the 26th November, and 4th December, still they were distinctly in the view of the government, and were substantially referred to in the private letters which accompanied the orders; because the reservation of one third of the tonnage of each vessel, for the king's use, was provided for in the additional articles, and no where else. The modification of the first order by the second, made upon the suggestion of Hope and Co., as may fairly be inferred from the letter to Ouvrard and Co. of the 6th of May, 1805, and the peculiar language of the passport of Mr. Parish; are additional links in the chain, which connect these orders with the contract. If, after all, any doubt should remain upon the subject, it must be removed by the letter of Espinosa to Hope and Co., dated the 24th September, 1807; which establishes most clearly the following facts: First, that Hope and Co. by their agreement with Ouvrard and Co., of the 6th of May, 1805, had assumed upon themselves the fulfilment of the contract, and additional articles between F. Ouvrard and the crown; which contract, between Ouvrard and Co. and Hope and Co., was approved of by the crown of Spain, and effect given to it, by the royal order of the 9th August, 1805. Second, that by the common consent of those houses, Mr. Parish was appointed general agent in the United States, to facilitate the shipments, and to prepare and direct them. Third, for the purpose of effecting those contracts, permissions had been transmitted by the crown, through Ouvrard and Co., to Hope and Co., and by them to the general agent; who, under them, had caused a number of shipments to be made, from the United States to different ports in South America; invoices of which had been transmitted to the Spanish government. Fourth, that Mr. Parish had made remittances for the payment of the duties on those expeditions, which Hope and Co., representing Ouvrard and Co., were bound to remit to the royal chest of consolidation. Fifth, that the royal order of the 24th of December, though it spoke only of the shipments

from Europe, intended to countenance shipments from the United States, for the purpose of being neutralized; because the order states, that the Spanish minister in the United States, was informed and was directed to require duplicate invoices to be made out and certified. Lastly, that Hope and Co., as the representatives of Ouvrard and Co., were bound to pay the duties, without any exception; to account for the share of the profits of the trade, belonging to the crown, and generally to fulfil every part of Ouvrard and Co.'s engagement. This letter contains a full history of these transactions, from the beginning to the close of them, and with the light it throws upon them, it is not difficult to fit the different parts together, so as to make of them one entire and harmonious body, of which the contracts of the 26th November and 4th December, 1804, are the base; and the royal orders, the licenses, and the shipments, are the superstructure.

It was contended, by the plaintiff's counsel, that the order of the 24th December, could not be in execution of the contracts, because the former is general, and the latter confined to expeditions to and from Europe. This is all very true; but it can never be said, because a party does more than he has contracted to do, and this for the benefit of the other party, he has not fulfilled his contract. The order enlarges the privilege granted to Ouvrard and Co. by the contract, and consequently could not be complained of by them. Again, it is said, that the contract grants no monopoly of the colonial trade to Ouvrard and Co., and therefore, that the defendants and others, who made shipments under royal licenses, are bound to pay the duties, unless they can show that they acted as agents of Ouvrard and Co. Let it be granted, that no monopoly was intended by the contract; still, if the licenses under which the defendants made those shipments were issued, in virtue of the contract with Francis Ouvrard, and were delivered to them, by the agent of Hope and Co., who received them from Ouvrard and Co., facts which cannot be controverted; the question of liability for the duties, must at least be determined in reference to those contracts. If then, the order of the 24th December was issued in execution of the contracts, it cannot be said to be a law to control and alter them. If it be inconsistent with the contracts, it would seem difficult to support this action, which is founded upon an implied assumpsit by the defendants, to pay the duties imposed by the order, in the face of an express contract, with which the implied one is at variance. But the respect, which the court owes to the elevated station of the person who issued this order, as well as an adherence to general principles of law, forbid us to construe the order so as to place it in hostility with the contracts, if a different construction can fairly be given to it. I think there is no difficulty, in making them harmonize with each other.

The 18th article of the contract of the 26th of November, stipulates, that the duties are to be paid in Spain; and consequently, it would seem to follow, that they were to be paid by Ouvrard and Co., parties to that contract. But all doubt upon this subject is removed by the 8th additional article, which professes to be intended to explain the 18th article of the original contract, with regard to the payment of the import and export duties to be made to the king by Ouvrard and Co. To reconcile the order, which directs that the duties shall be paid by the shippers, with the contracts, which stipulate that they shall be paid by Ouvrard and Co.; we may fairly suppose, that Ouvrard and Co. to whom the privilege of carrying on this trade was granted, were to be considered as shippers, in the view of the contract; whoever might be the actual shippers, under the licenses to be granted to Ouvrard and Co., under the contract. This construction is supported by a number of additional reasons, the force of which it is difficult to resist. In the first place, it may be remarked, that the contrary construction, would, in almost every instance, have defeated the contract itself, so far as it related to the payment of the duties. For, by the eighteenth article, it was stipulated, that the duties should be paid in Spain, within two months after advice received of their arrival in America. This, then, would have allowed to the shipper, residing in the United States, but two months to obtain notice, that the Spanish government, or Ouvrard and Co., had received advice of the arrival of the vessel in the Spanish colony, and to remit the duties to the Spanish treasury. This would have been frequently, if not always, impossible; and therefore, a construction which leads to such a result, cannot be well founded. But this objection is entirely removed, by considering Ouvrard and Co. as the persons who were to make the payment, and the two months allowed to them, as a credit after they received the advice of the arrival. In the next place, is it reasonable to suppose, that the Spanish government would look for the payment of their duties to persons residing in foreign countries, with whose character, solidity, and even names, the officers of the treasury department must be entirely unacquainted? And if the government so understood the order, is it conceivable that the minister or the other public functionaries, residing in the United States, would not have been directed to receive the duties; or, at least, to have taken security for their payment? Yet no measure of this kind was adopted. In short, the letter of Espinosa above referred to, plainly contradicts the construction insisted upon by the plaintiff's counsel, and strongly supports that which we have given. But, if we must give a strict and literal construction to the order of the 24th of December; I would inquire how this action can, upon any principle, be supported? That order, it is true, states that the duties

are to be paid by the shippers: But what shippers? The answer is, the mercantile houses enumerated in the order; because, as this privilege, was by the order itself, confined to particular houses, whose names are mentioned in it, the duties were of course to be paid by them. This is rendered still more obvious, by the letter which accompanied the order, addressed to the minister abroad; which, after enumerating the privileged houses, .states, that the duties are to be paid by the shippers. This order, as to the houses mentioned in it, was revoked by that of the 9th of August, in which not one word is said about duties. Upon this construction then, of the order of the 24th December, it would be a sufficient answer for the defendants to make to this action; that they are not the shippers, who by that order were required to pay the duties, and this would compel the plaintiff to resort to the contracts, by which Ouvrard and Co. were bound to pay the duties. For, although a literal construction of the two orders taken together, (which they ought to be,) would render the liability for the duties co-extensive with the privilege; still this liability must be in reference to the contracts, with which those orders were connected, and which they were intended to carry into effect. But upon this contract, the defendants cannot be charged, because they were not parties to it. Neither can they be charged upon an implied contract to pay the duties, in consideration of the privileges of which they have enjoyed the benefit; because this would be inconsistent with the express contract, by which Ouvrard and Co. were bound to pay them; and consequently, the law will not raise such a contract. If Ouvrard and Co. were the debtors for these duties, (which they incontestably were) then the defendants were debtors to Ouvrard and Co.; and there is no principle in law, which will sanction an action by the creditor, against the debtor of his debtor, upon the ground of contract; for this plain reason, that there is no privity between them. If the defendants are now bound to pay duties to the plaintiff, they not only might, but they ought, to have paid them when they became due; and by doing so, they might have embarrassed the accounts between Ouvrard and Co., and the crown, and have produced the most serious inconveniences. if not injury, to Ouvrard and Co.; who, calculating upon their own responsibility for the duties, would regulate their transactions with the Spanish treasury accordingly.

Upon the whole, it is the opinion of the court, that the defendants were at no time liable to pay those duties to the crown of Spain; and that David Parish was fully authorised to receive the duties from them, and to give them a discharge. But if the law were otherwise, the court are of opinion, that the duties having been applied towards the discharge of the Dutch loan, due by the crown of Spain; (if the jury should be satis-

fied from the evidence that the duties paid by the defendants, were so applied,) the present action cannot be supported. The case is entirely disembarrassed of many of the nice and delicate questions, which were investigated at the bar. It is not necessary to decide, whether at the time the arrangement was made between Hope and Co., and Solere, the head of the Spanish treasury, with the assent of Ouvrard and Co., for applying these duties in discharge of the Dutch loan; Joseph Buonaparte was considered as the king de facto or as the king de jure, or as a usurper, engaged in a struggle to obtain the crown by force of arms; and whether, in either of those characters, a payment to him would be binding or not upon the present sovereign. The facts of this case keep us perfectly clear of all these difficulties. The Dutch loan had been negotiated by Hope and Co., for and on account of Charles IV., the undisputed sovereign of Spain; for the repayment of which, he bound himself, the nation, and his successors, and pledged the whole of his revenues for its security. The duties which formed a part of those revenues, came legally into the hands of Hope and Co., with the consent of Ouvrard and Co., and the Spanish government, and they were applied to the liquidation of the debt due upon the loan, so far as the amount of them extended. Let it be, as was argued, that the consent of the Spanish government, under the administration of Joseph, was invalid and of no obligation upon Ferdinand; still, Ferdinand, as the successor of his father, and the nation, were and are bound to pay the debt due in Holland; and if it has been in part discharged, out of funds charged with the payment of it, in the hands of Hope and Co., the payments of the duties, have in effect been made to the plaintiff, because he owes, of the debt due in Holland, less than what was originally due, by the amount of duties which were applied to its discharge by Hope and Co. After such an application, which I repeat it, Hope and Co. were authorized to make, under all the circumstances of the case, this action cannot be supported, to recover the amount of the duties so appropriated. Verdict for defendants.