**HUNGARIAN PEOPLE'S REPUBLIC**
**v.**
**CECIL ASSOCIATES, Inc. et al.**

United States District Court,
S. D. New York.

Dec. 29, 1953.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff.

George Mandelbaum, New York City, for defendants.

SUGARMAN, District Judge.

On or about May 29, 1951, the Hungarian People's Republic leased from Cecil Associates, Inc., the entire building at 7 East 84th Street, New York City. The written lease provided *inter alia* "[T]enant shall use and occupy demised premises for consular purposes. (sic) and for no other purpose" for a term of three years from June 1, 1951. A deposit of $9,000 was given to the landlord by the tenant to secure the latter's performance of its obligations under the lease.

On or about June 1, 1951, Cecil Associates, Inc., conveyed the demised prem-

ises to Alice Simon, Max Hofmann and Marcus Katz.

On December 28, 1951, the Secretary of State of the United States officially required the plaintiff to close its consular offices in New York City for the reason set forth in a note to the Minister of the Hungarian People's Republic, viz.:

" * * * The Secretary of State presents his compliments to the Minister of the Hungarian People's Republic and has the honor to refer to the recent detention in Hungary of four members of the United States Air Force. The Government of Hungary in this instance has again clearly failed to live up to the accepted standards of international practice with regard to the right of consular officers to exercise protective functions in behalf of nationals of their country. The detention of four Americans from November 19, 1951 to December 28, 1951 and the refusal by the Hungarian Government, despite repeated requests of the American Charge d'Affaires, to permit any access to them or communication with them on the part of American consular officers indicate that the Hungarian Government continues, as in previous cases, to place serious restrictions on the exercise of normal consular rights by United States representatives in Hungary. In these circumstances, the Government of the United States is not prepared to permit the continued operation of the Hungarian consulates general in Cleveland, Ohio, and New York, New York. The Minister is accordingly informed that these offices are required to cease all operations immediately and to be closed by midnight, December 31, 1951. Department of State, Washington, December 28, 1951."

On December 31, 1951, plaintiff vacated premises 7 East 84th Street, New York City.

By letter dated January 8, 1952, the attorneys for the tenant informed Cecil Associates, Inc., that by reason of the action of the State Department followed by the tenant's vacating of the premises "the lease between Cecil Associates, Inc., and the Hungarian People's Republic was automatically cancelled and terminated on December 31, 1951." Demand was made in that letter for the return of the $9,000 security deposit, and, the demand being refused, on June 17, 1952, this action was commenced by the tenant against Cecil Associates, Inc., to recover said sum, pleading frustration of the contract because of the act of the United States Government.

On October 28, 1952, an amended complaint was filed, to recover the security deposit from Cecil Associates, Inc., or from its grantees Alice Simon, Max Hofmann and Marcus Katz. The amended complaint alleges the conveyance of the premises to the individual defendants and alleges, in effect, that the corporate defendant may have transferred the security to its vendee, as allowed in paragraph numbered 32 in the lease.

The defendants answered the complaint with general denials, seven affirmative defenses and by way of counterclaim, the defendants Alice Simon, Max Hofmann and Marcus Katz allege that plaintiff was notified some time after June 1, 1951 that rent under the abovementioned lease was to be paid to them, and plaintiff did pay them the rent through the month ending December 31, 1951, but not thereafter. Further alleging plaintiff's wrongful abandonment of the premises, said defendants claim damages in the amount of $9,205 allegedly sustained by them up to the time they resold the premises on May 7, 1952, being loss of rent for the months of January through May, 1952, at $1,500 per month, broker's commissions for negotiating the lease in the amount of $1,205, attorneys fees and certain expenses for cleaning the premises after plaintiff vacated.

In a second counterclaim, the individual defendants further allege that on resale of the premises in a vacant state, they received $20,000 less than they would have received had plaintiff re-

mained in possession under its lease. This they claim plus $4,237.50 brokerage on the resale and attorney's fees in the amount of $500, as further damages.

By way of a third counterclaim, the said defendants also claim the sum of $43,500, representing the monthly rentals from January 1, 1952 through May 31, 1954 at $1,500 per month.

In their fourth counterclaim, the individual defendants assert that their net profit from renting to the plaintiff under the lease would have been $10,000 per annum. By reason of plaintiff's alleged breach, they also claim damages for loss of anticipated profits for two years, five months at $10,000 per annum or $24,165.

The Hungarian People's Republic now moves "for an order dismissing the four counterclaims of the Answer herein, on the ground that such counterclaims fail to state claims upon which relief can be granted, in that they seek affirmative judgment against an immune sovereign, which has not consented to the entry thereof".

Following the argument of the motion, the court addressed the following letter to the Secretary of State:

"November 25, 1953
"Honorable John Foster Dulles
"The Secretary of State
"Washington, D. C.
"My dear Mr. Secretary:
"There is now pending in the United States District Court for the Southern District of New York an action brought by the Hungarian People's Republic against Cecil Associates, Inc., Alice Simon, Max Hoffmann and Marcus Katz, to recover the sum of nine thousand dollars deposited by it with defendant as security for plaintiff's faithful performance of the terms of a certain lease.

"By the terms of this lease, dated May 29, 1951, the Hungarian People's Republic rented premises 7 East 84th Street, New York City, for consular purposes only for a term of three years from June 1, 1951. However, the Secretary of State of the United States, by note dated December 28, 1951 to the Minister of the Hungarian People's Republic, required that the Hungarian consulate general be closed by December 31, 1951. Claiming frustration of the contract because of this act of the United States Government, the Hungarian People's Republic commenced the above mentioned suit.

"The individual defendants who took title to the premises after the execution of the plaintiff's lease have asserted a counterclaim against the Hungarian People's Republic in this suit claiming that the plaintiff is liable to them for damages in a sum in excess of nine thousand dollars by reason of plaintiff's alleged breach of the lease by its abandonment of the demised premises before the expiration of the term.

"The Hungarian People's Republic, by motion argued before me on October 27, 1953, move for an order dismissing the counterclaim 'in that they seek affirmative judgment against an immune sovereign, which has not consented to the entry thereof'.

"No proof was adduced on this motion sufficient for me to find that the Hungarian People's Republic is a friendly foreign sovereign and as such entitled to immunity from suit.

"The 'accepted course of procedure' referred to in Ex parte [Republic of] Peru, 318 U.S. 578, 581 [63 S.Ct. 793, 87 L.Ed. 1014], was not followed in the instant case. Judge Clark of this Circuit in Puente v. Spanish National State [2 Cir.], 116 F.2d 43, 45, referred to the practice of judicial inquiry addressed to the executive in case of doubt as to the sovereign character of a defendant claiming immunity. Accordingly, to resolve my doubt as

to the Hungarian People's Republic's entitlement to claim the immunity accorded a friendly foreign sovereign, I address this inquiry to you.

"Will you kindly advise this court whether the Department of State recognizes and allows the claim of the Hungarian People's Republic to immunity from suit as a friendly foreign sovereign?

"An early reply would be greatly appreciated so that I might dispose of this pending motion without unreasonable delay * * *".

The reply thereto follows:

"December 18, 1953

"My dear Judge Sugarman:

"The Department has received your letter of November 25, 1953, concerning an action now pending in the United States District Court for the Southern District of New York, in which the Hungarian People's Republic is suing Cecil Associates, Inc., Alice Simon, Max Hoffmann and Marcus Katz, to recover a sum of money deposited as security for faithful performance of the terms of a lease. You state that the defendants have asserted a counterclaim against the Hungarian People's Republic for damages resulting from an alleged breach of the lease, and that the latter has moved for an order dismissing the counterclaim 'in that they seek affirmative judgment against an immune sovereign, which has not consented to the entry thereof.'

"You inquire whether the Department of State 'recognizes and allows the claim of the Hungarian People's Republic to immunity from suit as a friendly foreign sovereign'. The United States Government recognizes the Hungarian People's Republic and maintains diplomatic relations with it. However, no claim of immunity has been made to the Department by any representative of the Hungarian People's Republic in this matter, and, on the basis of the information set forth in your letter, the Department does not recognize and allow any such claim now made to the court * * *".

The recognition of the Hungarian People's Republic by the government of the United States and the maintenance of diplomatic relations between them, however strained, accords to the Hungarian People's Republic the right to appear in the suit and to raise the jurisdictional question. This, notwithstanding the election by the Hungarian People's Republic not to bring its status to the court's notice by the accepted diplomatic practice of representations by the foreign sovereign to our State Department and the attendant suggestion of immunity to the court by the State Department on the recognition and allowance by the State Department of a claim of immunity.[1]

Having invoked the process of this court in its quest of the $9,000 deposit under the lease, the Hungarian People's Republic, to that extent, has consented to jurisdiction and cannot be heard to plead immunity against the granting to the defendants, by way of set-off, of relief at least to the extent to which the plaintiff seeks affirmative judgment.[2]

The troublesome question is whether the commencement of this suit by the Hungarian People's Republic constitutes consent to jurisdiction beyond a set-off equal to the plaintiff's claim. It is urged by the defendants that the plaintiff by submitting itself to the jurisdiction of this court thereby suffers a total loss of immunity and may be held accountable for damages in excess of its $9,000 claim.

In view of the certification by the Department of State that diplomatic re-

1. In re Muir, 254 U.S. 522, 532, 41 S. Ct. 185, 65 L.Ed. 383.

2. United States v. New York Trust Co., D.C.S.D.N.Y., 75 F.Supp. 583.

lations prevail between this government and the Hungarian People's Republic, the only basis upon which the defendant's contention might be sustained is that, despite those diplomatic relations, the Hungarian People's Republic is not a friendly foreign sovereign.

The defendants argue that the unique facts here presented call for an exception to the general rule that a defendant's claim against a foreign sovereign plaintiff is limited to a set-off. They point to the diplomatic note of December 28, 1951 and the reasons therein for the demand by the United States that the plaintiff's consular office in New York be closed and ask a finding thereon that the plaintiff is not a friendly foreign sovereign and hence is shorn of its immunity to judgment in excess of its claim.

■ This contention must be rejected for the "friendliness" of a foreign sovereign, with whom diplomatic relations are maintained, is a subject for political and not judicial determination. Great embarrassment might be caused the executive branch of the government in its relations with foreign nations if the judiciary were to undertake in individual cases the determination of whether a foreign sovereign with whom diplomatic relations are maintained is friendly or otherwise.[3]

The motion to dismiss the four counterclaims of the answer herein is granted to the extent that the same shall be deemed as a set-off limited to the claim, if any, to which plaintiff may establish its right under its complaint herein.

3. "It is a doctrine borne of expediency, nourished in the council halls of nations as well as the courts of justice. Its dominant motif is political. It has gained stature in the world of international diplomacy and politics, where an 'incident' involving the dignity of nations is measured by its explosive potential as well as its legal implications. ' * * * it rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign state to be re-examined and perhaps condemned by the courts of another would very certainly "imperil the amicable relations between governments and vex the peace of nations" '. Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726." Frazier v. Foreign Bondholders Protective Council, Inc., App. Div., 125 N.Y.S.2d 900, 903.