NATIONAL CITY BANK OF NEW YORK *v.*
REPUBLIC OF CHINA ET AL.

No. 30. Argued November 9, 1954.—
Decided March 7, 1955.

*Wm. Harvey Reeves* argued the cause for petitioner.
With him on the brief was *Chauncey B. Garver.*

*Louis J. Gusmano* argued the cause for respondents.
With him on a brief for the Republic of China were
*Cletus Keating* and *Robert E. Kline, Jr.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The Shanghai-Nanking Railway Administration, an official agency of respondent Republic of China, established a $200,000 deposit account in 1948 with the New York head office of petitioner National City Bank of New York. Subsequently, respondent sought to withdraw the funds, but petitioner refused to pay, and respondent brought suit in Federal District Court under 48 Stat. 184, as amended, 12 U. S. C. § 632.

In addition to various defenses, petitioner interposed two counterclaims seeking an affirmative judgment for $1,634,432 on defaulted Treasury Notes of respondent owned by petitioner.[1]  After a plea of sovereign immunity, the District Court dismissed the counterclaims, 108 F. Supp. 766, and entered judgment on them pursuant to Rule 54 (b), Federal Rules of Civil Procedure.  Petitioner appealed, and while the appeal was pending sought leave from the District Court to amend the counterclaims by denominating them setoffs and including additional data. The District Court denied leave.  14 F. R. D. 186.  The Court of Appeals for the Second Circuit affirmed the dismissal and the denial on the ground that the counterclaims were not based on the subject matter of respondent's suit (whether they be treated as requests for affirma-

---

[1] The Treasury Note on which the first counterclaim is based was pledged by the Republic of China in 1920 to secure a loan to the Pacific Development Company by a banking syndicate in which petitioner participated.  The loan was not repaid, and during the liquidation of the Development Company the syndicate bought the collateral at a public sale.  The Treasury Notes on which the second counterclaim is based were purchased by petitioner's Shanghai branch at the time of issue in 1947–1948.  The record allows us to assume that the petitioner gave full value as its share of the loan to the Development Company and bought the notes in the second counterclaim at par.

tive relief or as setoffs) and, therefore, it would be an invasion of respondent's sovereign immunity for our courts to permit them to be pursued. 208 F. 2d 627. Because of the importance of the question and its first appearance in this Court, we granted certiorari.[2] 347 U. S. 951.

The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court. Accordingly, we start with the fact that the Republic and its governmental agencies enjoy a foreign sovereign's immunities to the same extent as any other country duly recognized by the United States. See *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, 137–138.

The freedom of a foreign sovereign from being haled into court as a defendant has impressive title-deeds. Very early in our history this immunity was recognized, *De Moitez* v. *The South Carolina,* Bee 422, 17 Fed. Cas. 574, No. 9,697 (Admiralty Court of Pa., 1781, Francis Hopkinson, J.), and it has since become part of the fabric of our law. It has become such solely through adjudications of this Court. Unlike the special position accorded our States as party defendants by the Eleventh Amend-

---

[2] At the outset respondent argues that since petitioner on certiorari has dropped its demand for affirmative relief, the case is not properly before us. It is conceded that dismissal of independent counterclaims would ordinarily contain the requisite finality on which to base our jurisdiction, but respondent contends that when petitioner reduced its counterclaims to mere demands for setoff, the claims became defenses and, as such, nonreviewable until the respondent's suit had been concluded below. We reject this view. A counterclaim does not dwindle to a defense solely because it is confined—as a result of the accepted jurisprudence of sovereign immunity, see *United States* v. *Shaw,* 309 U. S. 495—to reducing the sovereign's recovery. The District Court's judgment, as affirmed by the Court of Appeals, terminated a separable and distinct segment of the litigation.

ment, the privileged position of a foreign state is not an explicit command of the Constitution. It rests on considerations of policy given legal sanction by this Court. To be sure, the nonsuability of the United States without its consent is likewise derived from considerations of policy. But these are of a different order from those that give a foreign nation such immunity. It is idle to repeat or rehearse the different considerations set forth in Mr. Chief Justice Marshall's classic opinion in *The Schooner Exchange* v. *M'Faddon*, 7 Cranch 116.

But even the immunity enjoyed by the United States as territorial sovereign is a legal doctrine which has not been favored by the test of time. It has increasingly been found to be in conflict with the growing subjection of governmental action to the moral judgment. A reflection of this steady shift in attitude toward the American sovereign's immunity is found in such observations in unanimous opinions of this Court as "Public opinion as to the peculiar rights and preferences due to the sovereign has changed," *Davis* v. *Pringle*, 268 U. S. 315, 318; "There is no doubt an intermittent tendency on the part of governments to be a little less grasping than they have been in the past . . . ," *White* v. *Mechanics Securities Corp.*, 269 U. S. 283, 301; ". . . the present climate of opinion . . . has brought governmental immunity from suit into disfavor . . . ," *Keifer & Keifer* v. *Reconstruction Finance Corp.*, 306 U. S. 381, 391. This chilly feeling against sovereign immunity began to reflect itself in federal legislation in 1797.[3] At that early day Congress decided that when the United States sues an individual, the individual can set off all debts properly due him from the sovereign. And because of the objections to *ad hoc* legislative allowance of private claims, Congress a hundred

[3] Act of Mar. 3, 1797, §§ 3, 4, 1 Stat. 514–515. The present version appears in 28 U. S. C. § 2406.

years ago created the Court of Claims,[4] where the United States, like any other obligor, may affirmatively be held to its undertakings. This amenability to suit has become a commonplace in regard to the various agencies which carry out "the enlarged scope of government in economic affairs," *Keifer & Keifer* v. *Reconstruction Finance Corp., supra,* at 390. The substantive sweep of amenability to judicial process has likewise grown apace.[5]

The outlook and feeling thus reflected are not merely relevant to our problem. They are important. The claims of dominant opinion rooted in sentiments of justice and public morality are among the most powerful shaping-forces in lawmaking by courts. Legislation and adjudication are interacting influences in the development of law. A steady legislative trend, presumably manifesting a strong social policy, properly makes demands on the judicial process. See James M. Landis, Statutes and the Sources of Law, in Harvard Legal Essays (1934), p. 213 *et seq.;* Harlan F. Stone, The Common Law in the United States, 50 Harv. L. Rev. 4, 13–16.

More immediately touching the evolution of legal doctrines regarding a foreign sovereign's immunity is the restrictive policy that our State Department has taken toward the claim of such immunity. As the responsible agency for the conduct of foreign affairs, the State Department is the normal means of suggesting to the courts that a sovereign be granted immunity from a particular suit. *Ex parte Republic of Peru,* 318 U. S. 578, 581. Its failure or refusal to suggest such immunity has been accorded significant weight by this Court. See *Compania Espanola de Navigacion Maritima, S. A.* v. *The Navemar,*

---

[4] Act of Feb. 24, 1855, 10 Stat. 612, as amended, 12 Stat. 765, 14 Stat. 9; see *United States* v. *Jones,* 119 U. S. 477.

[5] The most recent development is the subjection of the Government to tort liability. Act of Aug. 2, 1946, now 28 U. S. C. § 1346 (b).

303 U. S. 68; *Republic of Mexico* v. *Hoffman*, 324 U. S. 30. And this for the reason that a major consideration for the rule enunciated in *The Schooner Exchange* is the embarrassing consequences which judicial rejection of a claim of sovereign immunity may have on diplomatic relations. Recently the State Department has pronounced broadly against recognizing sovereign immunity for the commercial operations of a foreign government, 26 Dept. State Bull. 984 (1952), despite the fact that this Court thirty years earlier rejected the weighty opinion of Judge Mack in *The Pesaro*, 277 F. 473 (see, also, his opinion in *The Gloria*, 286 F. 188), for differentiating between commercial and war vessels of governments. *Berizzi Bros. Co.* v. *Steamship Pesaro*, 271 U. S. 562.

And so we come to the immediate situation before us. The short of the matter is that we are not dealing with an attempt to bring a recognized foreign government into one of our courts as a defendant and subject it to the rule of law to which nongovernmental obligors must bow. We have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery.[6] It wants our law, like any other

---

[6] Those cases that have dealt with the problem include: *Republic of China* v. *American Express Co.*, 195 F. 2d 230 (C. A. 2d Cir.); *United States* v. *National City Bank of New York*, 83 F. 2d 236 (C. A. 2d Cir.); *In re Patterson-MacDonald Shipbuilding Co.*, 293 F. 192 (C. A. 9th Cir.); *Kingdom of Roumania* v. *Guaranty Trust Co.*, 250 F. 341 (C. A. 2d Cir.); *Hungarian People's Republic* v. *Cecil Associates, Inc.*, 118 F. Supp. 954 (D. C. S. D. N. Y.); *Republic of China* v. *Pang-Tsu Mow*, 105 F. Supp. 411 (D. C. D. C.); *United States* v. *National City Bank of New York*, 90 F. Supp. 448 (D. C. S. D. N. Y.); *United States* v. *New York Trust Co.*, 75 F. Supp. 583 (D. C. S. D. N. Y.); *Kingdom of Norway* v. *Federal Sugar Refining Co.*, 286 F. 188 (D. C. S. D. N. Y., Mack, J.); *French Republic* v. *Inland Nav. Co.*, 263 F. 410 (D. C. E. D. Mo.); *Union of Soviet Republics* v. *Belaiew*, 42 T. L. R. 21 (K. B. Div.); *South African Republic* v. *La Compagnie Franco-Belge*, [1898] 1 Ch. 190; cf. *Guaranty Trust Co.* v. *United States*, 304 U. S. 126; *Dexter & Car-*

362

litigant, but it wants our law free from the claims of justice. It becomes vital, therefore, to examine the extent to which the considerations which led this Court to bar a suit against a sovereign in *The Schooner Exchange* are applicable here to foreclose a court from determining, according to prevailing law, whether the Republic of China's claim against the National City Bank would be unjustly enforced by disregarding legitimate claims against the Republic of China. As expounded in *The Schooner Exchange,* the doctrine is one of implied consent by the territorial sovereign to exempt the foreign sovereign from its "exclusive and absolute" jurisdiction, the implication deriving from standards of public morality, fair dealing, reciprocal self-interest, and respect for the "power and dignity" of the foreign sovereign.[7]

---

penter, Inc. v. *Kunglig Jarnvagsstyrelsen,* 43 F. 2d 705 (C. A. 2d Cir.); *Strousberg* v. *Republic of Costa Rica,* 44 L. T. R. (N. S.) 199 (C. A.); Claim of the Russian Volunteer Fleet against the British Admiralty, Annual Digest of Public International Law Cases 1925–1926, p. 210 (British Admiralty Transport Arbitration Board; affirmed by Court of Appeal).

Of the cited American decisions, only two district court cases directly involved the dismissal of counterclaims not based on the subject matter of the sovereign's suit and not seeking affirmative judgment: *Republic of China* v. *Pang-Tsu Mow, supra,* and *United States* v. *New York Trust Co., supra.*

[7] 7 Cranch, at 136–137, 143–144. For a comprehensive critique of the doctrine as it has subsequently been applied, see Lauterpacht, The Problem of Jurisdictional Immunities of Foreign States, 28 Brit. Y. B. Int'l L. 220.

The Privy Council recently rejected the view of Lord Justice Scrutton in *The Jupiter,* [1924] P. 236 (C. A.), that the mere assertion of a claim by a foreign government to property the subject of an action by a private party compels the court to stay the action and decline jurisdiction. *Juan Ysmael & Co.* v. *Republic of Indonesia,* [1954] 3 W. L. R. 531. Earl Jowitt reviewed the decisions and indicated some of the subtleties into which the doctrine has led the English courts. Cf. *Republic of Mexico* v. *Hoffman,* 324 U. S. 30, 38–42 (concurring opinion).

(a) The Court of Claims is available to foreign nationals (or their governments) on a simple condition: that the foreign national's government can be sued in its courts on claims by our citizens.[8] An American or a Chinese [9] could sue in the Court of Claims for default on a United States bond, 28 U. S. C. § 1491 (4), or could counterclaim—to the extent of the Government's claim—in a suit by the United States in any court, 28 U. S. C. § 2406; see *United States* v. *Wilkins,* 6 Wheat. 135; cf. *United States* v. *Bank of the Metropolis,* 15 Pet. 377; *United States* v. *United States F. & G. Co.,* 309 U. S. 506, 511. Thus it seems only fair to subject a foreign sovereign, coming into our courts by its own choice, to a liability substantially less than our own Government long ago willingly assumed.

(b) The Republic of China is apparently suable on contract claims in its own courts,[10] and Americans have the same rights as Chinese in those courts.[11] No parochial bias is manifest in our courts which would make it an affront to the "power and dignity" of the Republic of China for us to subject it to counterclaims in our courts when it entertains affirmative suits in its own. Decisions of the Chinese courts which seem to grant absolute

---

[8] 28 U. S. C. § 2502. The earliest version of this statute appears in 15 Stat. 243 (Act of July 27, 1868); see *United States* v. *O'Keefe,* 11 Wall. 178; cf. 43 Stat. 1113, 46 U. S. C. § 785; *Westfal-Larsen & Co.* v. *United States,* 41 F. 2d 550 (D. C. N. D. Calif.). That an American citizen can sue the Chinese Government in Chinese courts, see Judicial Yuan Interpretation No. 6 (Feb. 16, 1929).

[9] See Treaty of Nov. 4, 1946, Art. VI, § 4, 63 Stat. 1305.

[10] Judicial Yuan Interpretation No. 373 (Dec. 15, 1930); Supreme Court Uniform Interpretation No. 1933 (Peking, June 22, 1925), 3 China L. Rev., No. 2, p. 84; cf. Judicial Yuan Interpretation No. 6 (Feb. 16, 1929); Constitution of the Republic of China, Art. 24 (1947).

[11] Treaty of Nov. 4, 1946, Art. VI, § 4, 63 Stat. 1305.

immunity from direct suit to foreign sovereigns[12] are inapposite in this context and in light of our State Department's reluctance to raise the defense of sovereign immunity in foreign courts, see 26 Dept. State Bull. 984, 985 (1952); cf. 41 Stat. 527, 46 U. S. C. § 747.

(c) Respondent urges that fiscal management falls within the category of immune operations of a foreign government as defined by the State Department's 1952 pronouncement. This is not to be denied, but it is beside the point. A sovereign has freely come as a suitor into our courts; our State Department neither has been asked nor has it given the slightest intimation that in its judgment allowance of counterclaims in such a situation would embarrass friendly relations with the Republic of China.

(d) It is recognized that a counterclaim based on the subject matter of a sovereign's suit is allowed to cut into the doctrine of immunity.[13] This is proof positive that the doctrine is not absolute, and that considerations of fair play must be taken into account in its application. But the limitation of "based on the subject matter" is too indeterminate, indeed too capricious, to mark the bounds of the limitations on the doctrine of sovereign immunity. There is great diversity among courts on what is and what is not a claim "based on the subject matter of the suit" or "growing out of the same transaction." See Clark, Code Pleading (2d ed.), 653–660; cf. *United States* v. *National City Bank of New York,* 83 F. 2d 236 (C. A. 2d Cir.). No doubt the present counterclaims cannot fairly be deemed to be related to the

---

[12] See *Rizaeff Frères* v. *The Soviet Mercantile Fleet,* 3 China L. Rev., No. 6, p. 14 (Provisional Court of Shanghai 1927).

[13] *E. g., Hungarian People's Republic* v. *Cecil Associates, Inc.,* 118 F. Supp. 954 (D. C. S. D. N. Y.); *French Republic* v. *Inland Nav. Co.,* 263 F. 410 (D. C. E. D. Mo.); cf. *Republic of China* v. *American Express Co.,* 195 F. 2d 230 (C. A. 2d Cir.).

Railway Agency's deposit of funds except insofar as the transactions between the Republic of China and the petitioner may be regarded as aspects of a continuous business relationship. The point is that the ultimate thrust of the consideration of fair dealing which allows a setoff or counterclaim based on the same subject matter reaches the present situation. The considerations found controlling in *The Schooner Exchange* are not here present, and no consent to immunity can properly be implied. This conclusion was anticipated by Mr. Justice Washington on circuit four years after he had been of the Court which decided *The Schooner Exchange*.[14]

----

[14] The case is *King of Spain* v. *Oliver,* 1 Pet. C. C. 276, 14 Fed. Cas. 572, No. 7,813 (C. C. D. Pa.). The King of Spain had sued two Americans for duties he alleged they owed him on shipments of goods they had made to the Spanish American colonies under royal licenses. The defendants replied that they had obtained the licenses from and paid the duties to Hope & Co., a Dutch concern which had a commercial concession from the King in return for which it had promised, *inter alia,* to pay duties on shipments to the colonies. Hope had also negotiated a loan for the King in what appears to have been an unrelated transaction, and the King had pledged all his public revenues to repay the loan. Instead of handing over the duties received from defendants to the King, Hope applied them to reduce the debt due from the King on the loan.

Mr. Justice Washington directed a verdict for the defendants. First he held that there was no privity of contract between the defendants and the King, so that payment to Hope discharged them. But assuming that there was privity he ruled that the duties had been properly applied by Hope to reduce the King's debt to it. "Let it be, as was argued, that the consent of the Spanish government, under the administration of Joseph [Bonaparte, who had, while in power, agreed that the duties be applied to reduce the debt], was invalid and of no obligation upon Ferdinand; still, Ferdinand, as the *successor of his father* [Charles IV, to whom the loan had been made], and the nation, were and are bound to pay the debt due in Holland; and if it has been in part discharged, out of funds charged with the payment of it [because they were public revenues], in the hands of Hope and Co., the payments of the duties, have in effect been made to the plaintiff,

The judgment of the Court of Appeals must be reversed and the case remanded to the District Court with directions to reinstate the counterclaims and for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE REED, with whom MR. JUSTICE BURTON and MR. JUSTICE CLARK join, dissenting.

Some data must be premised if discussion is to be confined to a reasonable space. We start with the postulate that the sovereign is released from the jurisdiction of its own courts except as it may specifically submit itself to their power.[1]

That does not create a situation of irresponsibility. Satisfaction of sovereign liability may be had through the legislative organ which recognizes a moral obligation to pay the creditors of the government and to compensate those injured by it.

A sovereign's freedom from judicial control does not arise from or depend upon the will of the courts. As was said in *The Schooner Exchange* in speaking of the immunity of a foreign government, it depends upon "the will of the sovereign of the territory." ". . . all exemptions

---

because he owes, of the debt due in Holland, less than what was originally due, by the amount of duties which were applied to its discharge by Hope and Co. After such an application, which I repeat it, Hope and Co. were authorised to make, under all the circumstances of the case, this action cannot be supported, to recover the amount of the duties so appropriated." 1 Pet. C. C., at 289–290, 14 Fed. Cas., at 577.

[1] *United States* v. *Clarke,* 8 Pet. 436, 444; *Kansas* v. *United States,* 204 U. S. 331, 341; *Larson* v. *Domestic & Foreign Com. Corp.,* 337 U. S. 682, 703.

from territorial jurisdiction, must be derived from the consent of the sovereign . . . ." 7 Cranch 116, 138, 143. The immunity rests on the ground that no enforceable right exists "against the authority that makes the law on which the right depends." [2]

The reason for the sovereign's consent to the exclusion of foreign sovereignties from the general jurisdiction of its courts was said by Chief Justice Marshall to rest on this proposition:

> "The world being composed of distinct sovereignties, possessing equal rights and equal independence, whose mutual benefit is promoted by intercourse with each other, and by an interchange of those good offices which humanity dictates and its wants require, all sovereigns have consented to a relaxation in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers.
>
> "This consent may, in some instances, be tested by common usage, and by common opinion, growing out of that usage." 7 Cranch, at 136.

It might be summarized by the word "comity." [3] The local sovereign may, of course, withdraw such consent.

> "Without doubt, the sovereign of the place is capable of destroying this implication. He may claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals. But until such power be exerted in a manner not to be misunderstood, the sovereign cannot be con-

---

[2] *Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353; *United States* v. *Shaw*, 309 U. S. 495, 501. Cf. *Duff Development Co.* v. *Government of Kelantan*, [1924] A. C. 797.

[3] *Compania Naviera Vascongado* v. *S. S. Cristina*, [1938] A. C. 485, 498.

sidered as having imparted to the ordinary tribunals a jurisdiction, which it would be a breach of faith to exercise." *Id.*, at 146.[4]

An ancillary principle of law is that, in determining whether a defendant is a sovereign, the courts follow the guidance of the political branch.[5] In this case the sovereignty of the Republic of China is not questioned. Furthermore, the Chinese Government Treasury Note and its 36th Year Short Term Treasury Notes upon which the City Bank's counterclaims rest are sovereign obligations, *jure imperii* in form, of the highest public character. Consequently, the attitude of the Department of State as to the desirability of relaxing the strict rule of immunity as to acts of commerce, *jure gestionis*, is inapplicable. See 26 Dept. State Bull. 984 (1952), referred to in the Court's opinion, p. 361.

If the foregoing statements of law are sound, the Republic of China as a foreign sovereign is free from direct suits in our courts on the notes here in question unless the Congress of the United States has enacted a statute that restricts its immunity. This it has not done. The question in this case thus comes down to whether the Republic of China, by bringing this suit for the recovery of a bank deposit, waived its immunity and subjected itself to a counterclaim under the Fed. Rules Civ. Proc., Rule 13. Under the words of § (c) of that Rule, judgment over against the Republic of China would seem to be authorized if the counterclaim were for more than plaintiff's claim. But there would be no jurisdiction to render such judgment in an American court. It would violate the

---

[4] See *Berizzi Bros. Co.* v. *S. S. Pesaro,* 271 U. S. 562, 571 *et seq.*

[5] *Ex parte Peru,* 318 U. S. 578, 588; *Mexico* v. *Hoffman,* 324 U. S. 30, 35. Cf. *Duff Development Co.* v. *Government of Kelantan, supra,* at 815.

immunity of a foreign sovereign to do so.[6]   In the present case, the Court evidently feels that, since the counterclaim is limited to the amount of the Republic of China's claim, there is jurisdiction to allow a setoff to that extent. But the mere fact that a judgment over is not sought should not be relied upon to avoid the jurisdictional immunity of a foreign sovereign.   I find no justification for the Court's restricting that immunity in the absence of legislative or executive action.[7]

---

[6] Cf. *United States* v. *Shaw*, 309 U. S. 495, 502.   In *South African Republic* v. *La Compagnie Franco-Belge*, [1898] 1 Ch. 190, 198, a foreign sovereign sued to enjoin the use of deposited funds.   On a counterclaim not connected with the issue concerning the funds, Mr. Justice North held the foreign government could not be sued, citing *Duke of Brunswick* v. *King of Hanover*, 6 Beav. 68, and *Strousberg* v. *Republic of Costa Rica*, 29 Weekly Reporter 125, 44 L. T. R. (N. S.) 199.

[7] Probably because it is obvious that there is no tenable distinction between the setoff of an unrelated claim, a proceeding for a judgment over on a counterclaim, and a direct suit against a foreign sovereign, few cases have dealt with this phase of the immunity of a foreign sovereign from claims.   None that have discussed the issue have reached the result which the Court takes today.   In addition to the two cases cited in note 6 of the majority opinion, the same issue here presented was considered and decided in accord with my position in the only foreign case discussing the issue that has come to my attention.   In *The State of Belgium* v. *E. A. G. de Badts*, Nederlandsche Jurisprudentie, 1923, p. 618, Ann. Dig. of Pub. Int'l Law Cases 1919–1922, p. 129, the Belgian Government, a foreign sovereign, brought suit in the Dutch courts for an account of the sale of a certain cargo of wheat.   The defendant sought to set off an entirely unrelated claim which he had against the Belgian Government.   The court held:

"That the Court had no jurisdiction to take cognisance of the counter-claim against the Belgian State.   A State which is entitled to claim immunity from foreign jurisdiction does not lose this right by the fact that it submits to that jurisdiction in another suit.   The correctness of this statement is not impaired by the circumstance that the two actions are, for the sake of convenience, joined in the same proceed-

Affirmative legislative action was necessary to allow such a limited setoff against the United States.[8] Action of a similar nature should be required to authorize this setoff. The comity that gave the foreign sovereign full immunity from process was, as *The Schooner Exchange* pointed out, p. 146, only to be withdrawn "in a manner not to be misunderstood." That is by legislation.[9] The judicial creation of such jurisdiction over the property of a friendly nation might well merit the stricture of Chief Justice Marshall:

> "A nation would justly be considered as violating its faith, although that faith might not be expressly plighted, which should suddenly and without previous notice, exercise its territorial powers in a manner not consonant to the usages and received obligations of the civilized world." 7 Cranch, at 137.

International relations are pre-eminently a matter of public policy. Judicial views of supposed public interests are not the touchstone whereby to determine the law.[10]

---

ings, since the counter-claim does not lose, in consequence thereof, its independent character. This is so particularly in cases in which the plaintiff Government bases its claim on a private law title, but in counter-claim is sued for acts performed in its sovereign capacity."

Nor can the majority derive much support from *King of Spain* v. *Oliver,* 1 Pet. C. C. 276, cited on p. 365, n. 14, of the Court's opinion. The question of sovereign immunity was not considered or even mentioned in that case, since no setoff or counterclaim was asserted against the foreign sovereign. The court simply held that payment, in the manner and under the circumstances there presented, was a good defense to a suit on a debt.

[8] See *United States* v. *Shaw,* 309 U. S. 495, 501.

[9] See Lauterpacht, The Problem of Jurisdictional Immunities of Foreign States, British Year Book of International Law, 1951, vol. XXVIII, at pp. 239, 269; *Mexico* v. *Hoffman,* 324 U. S. 30, 38; *Berizzi Bros. Co.* v. *S. S. Pesaro,* 271 U. S. 562, 573, 576.

[10] *Vidal* v. *Philadelphia,* 2 How. 127, 197–198; *Muschany* v. *United States,* 324 U. S. 49, 66.

The change from a generous to a parsimonious application of the principle of sovereign immunity should come from Congress or the Executive. Our courts possess great powers and have solemn obligations. Our country allots power to the judiciary in the confidence that, in view of the separation of powers, judicial authority will not undertake determinations which are the primary concern of other branches of our Government. Differences of view exist as to the desirable scope of sovereign immunity and the necessity for nonjudicial determinations.[11] But surely it is better that the decisions be left to those organs of Government that have the responsibility for determining public policy in carrying out foreign affairs. The establishment of political or economic policies is not for the courts. Such action would be an abuse of judicial power. It is only by a conscious and determined purpose to keep the functions of the various branches of government separate that the courts can most effectively carry out their duties. I would leave this question of the jurisdictional immunity of foreign sovereigns to the other branches.

The Court determines, however, that the question of changing the limitation of the immunity of foreign sovereigns pertains to its functions. Even on the assumption that such is a proper matter for judicial concern, I would reach a different conclusion than does the Court. If a direct suit cannot be brought against a foreign sovereign (as is conceded), why should we allow the same claim to be used as an offset to destroy the sovereign's right to recover? Why should the City Bank be able to assert its notes against the Republic of China, even defensively, when other noteholders not obligated to the sovereign are prevented from collecting their notes?

---

[11] Dissents in *Great Northern Ins. Co.* v. *Read*, 322 U. S. 47, 57, and *Larson* v. *Domestic & Foreign Corp.*, 337 U. S. 682, 723; concurring opinion in *Mexico* v. *Hoffman*, 324 U. S. 30, 40.

Here we have an entirely disconnected claim on overdue national notes brought forward as a defense to an action to recover a bank deposit. The Court recognizes that the counterclaim is not related to China's cause of action against the City Bank. It says:

> "The point is that the ultimate thrust of the consideration of fair dealing which allows a setoff or counterclaim based on the same subject matter reaches the present situation."

The counterclaim here is of much the same character as a suit against a foreign sovereign. Deposits may be the lifeblood necessary for national existence. It is not wise for us to tell the nations of the world that any assets they may have in the United States, now or in the future, upon which suit must be brought, are subject to every counterclaim their debtors can acquire against them at par or at a discount. It is unfair to our foreign friends and detrimental to our own financial and mercantile interests. For fairness we need not go beyond the allowance of counterclaims arising out of transactions foreign sovereigns seek to enforce in our courts. It seems to me that the Court sanctions a circuitous evasion of the well-established rule prohibiting direct suits against foreign sovereigns.

I would affirm.