**REINO DE ESPANA, on its own behalf, and as trustee, Plaintiff,**

v.

**The AMERICAN BUREAU OF SHIPPING, INC., Defendant.**

**No. 03Civ.3573(LTS)(RLE).**

United States District Court, S.D. New York.

Aug. 4, 2004.

---

Brian D. Starer, Holland & Knight, Juan A. Anduiza, Holland & Knight, LLP, New York City, for Plaintiff.

Jeffrey R. Coleman, Steven Alan Hammond, Hughes Hubbard & Reed LLP, New York City, David J. Beck, Beck, Redden and Secrest, Houston, TX, Raymond Joseph Burke, Jr., Burke & Parsons, New York City, Robert B. (B.D.) Daniel, Troy Ford, Beck Redden & Secrest, LLP, Houston, TX, for Defendant.

## MEMORANDUM ORDER

SWAIN, District Judge.

This action arises from the sinking of the M.T. PRESTIGE, an oil tanker (the "Prestige"), off the coast of Plaintiff Reino de Espana ("Plaintiff" or "Spain") on November 19, 2002. The Prestige has discharged millions of gallons of oil into Plaintiff's coastal waters, and continues to do so. Plaintiff seeks damages from Defendant American Bureau of Shipping ("ABS") alleging that ABS was negligent in classifying the Prestige as fit to carry fuel cargoes. ABS asserts counterclaims seeking a declaratory judgment that Spain is obligated to indemnify ABS and/or contribute to payment of any damages assessed against ABS because of Spain's alleged negligence in responding to the Prestige disaster. Spain now moves, under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Defendant's counterclaims. For the following reasons, Plaintiff's Rule 12(b)(1) motion is granted.

## BACKGROUND

The following allegations are taken from Plaintiff's Complaint and/or Defendant's Answer and Counterclaims. ABS is engaged in the business of determining the fitness of vessels for their intended purposes through a procedure called classifi-

cation. (Compl. ¶ 16.) ABS surveyors inspect particular vessels as to their design, construction, and "operational maintenance" in light of standards established by ABS. (*Id.* ¶¶ 16–21.) Vessels in compliance with ABS standards are issued documents certifying their classification, and the vessels are listed in an "ABS Record" of vessels in the ABS classification "society." (*Id.* ¶¶ 22–25.)

At all times relevant to this action, the Prestige was listed in the ABS Record. (*Id.* ¶ 29.) The Prestige was built to comply with ABS' 1973 "Rules for Building and Classing Steel Vessels," and since its delivery in 1976 it has carried cargoes, including fuel oil, "by virtue of ABS classification and certification." (*Id.* ¶¶ 30–31.) Plaintiff alleges that the 1973 "Rules for Building and Classing Steel Vessels" did not include requirements concerning hull fatigue strength but that, in 1993, ABS developed the "ABS SafeHull" program that assessed the "fatigue life" and structural strength of steel vessels in light of certain fatigue criteria. (*Id.* ¶¶ 32–33.) Plaintiff alleges that the "as-built" structural details of the Prestige did not satisfy relevant ABS fatigue, and other, requirements for steel vessels. (*Id.* ¶ 33.)

On or about May 20, 2001, the Prestige completed its fifth "special or renewal survey," in which ABS inspected the Prestige and carried out various tests of its machinery, cargo and ballast tanks. (*Id.* ¶¶ 34–36.) Following the inspection, ABS issued various certificates for the Prestige. (*Id.* ¶ 36.) ABS conducted an "annual class survey" of the Prestige in Dubai, United Arab Emirates from May 15–26, 2002. (*Id.* ¶ 37.)

Following the oil spill of the M/V ERIKA in 1999 off the coast of France, ABS added requirements for oil tankers 15 years and older, including a requirement that certain water ballast tanks be examined internally at annual surveys. (*Id.*

¶ 38.) Plaintiff alleges that the water ballast tank requirement was in effect at the time of the Prestige's May 2002 annual survey, but that the ABS surveyor failed to comply with it. (*Id.*)

At the time of the incidents at issue, the registered owner of the Prestige was Mare Shipping Inc. ("Mare"), a Liberian corporation. From about the beginning of 2002, the Prestige was operated by Universe Maritime, Ltd. ("Universe"), a Liberian corporation with its principal place of business in Athens, Greece. (*Id.* ¶¶ 5–6.) On or about May 24, 2002, the Prestige was chartered by Crown Resources A.G. ("Crown"), a Swiss corporation. (*Id.* ¶¶ 7, 40.) The Prestige was to carry oil cargo owned by Crown. (*Id.*) After loading fuel cargo for Crown at St. Petersburg, Russia, in October 2002, and at Ventspils, Latvia, in early November, Crown directed the Prestige to proceed to Gibraltar for further orders. (*Id.* ¶¶ 41–43.) After its departure, fully laden, the Prestige suffered structural failures that resulted in the discharge of large amounts of its fuel cargo "in close proximity" to Plaintiff's shorelines and coastal regions. (*Id.* ¶ 43–44.) On or about November 19, 2002, the Prestige broke in two and eventually sank off the coast of Spain. (*Id.* ¶ 45.)

Defendant alleges that the sinking of the Prestige could have been avoided but for Spain's handling of the disaster. Spain was negligent, according to Defendant, in, among other things: refusing to allow the Prestige to enter a "place of refuge" on the Spanish coast despite repeated distress calls by the Prestige to Spanish instrumentalities; ordering the Prestige to restart its engines and move away from the Spanish mainland; wrongfully impeding the salvage efforts of Smit Tak Salvage; and failing to seek competent expert advice as required by Spain's National Plan for Contingencies caused by Accidental Marine

Pollution. *See* Answer and Counterclaims ("Answer") ¶¶ 117–144.

Legal proceedings have been commenced against ABS in the United States District Court for the Southern District of Texas and in the Republic of France in connection with the Prestige disaster. (Answer ¶ 119; Declaration of Geraldine Pageard, Ex. A. to Hammond Decl.) The Texas action, brought by certain constituents of the Basque Country of Spain, was transferred to this Court and is pending before the undersigned as *Communidad Autonomo Del Pais Vasco, et al. v. ABS,* 04 Civ. 671(LTS)(RLE).

ABS' counterclaims seek a declaratory judgment that "as between [Spain] and ABS, [Spain] is wholly or principally liable for any damages arising out of the *Prestige* casualty and must wholly indemnify ABS and/or contribute to payment of damages assessed in any judgment against ABS anywhere in the world[.]" (Answer at 30.) Plaintiff contends that the Court lacks subject matter jurisdiction of ABS' counterclaims because they are barred by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–11 ("FSIA").

## DISCUSSION

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). A district court may refer to evidence outside the pleadings in resolving a Rule 12(b)(1) motion. *Id.* The party asserting jurisdiction has the burden of "showing by a preponderance of the evidence that subject matter jurisdiction exists," and that showing "is not made by drawing from the pleadings inferences favorable to [that party]." *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir.2003) (internal citations and quotation marks omitted).

Under the FSIA, a foreign state is immune from the jurisdiction of the courts of the United States except as provided in 28 U.S.C. sections 1605 to 1607. 28 U.S.C.A. § 1604 (West 1994). "Once the [party against which claims or counterclaims are asserted] presents a prima facie case that it is a foreign sovereign, the [party asserting the claims] has the burden of going forward with evidence showing that, under [the statutory] exceptions to the FSIA, immunity should not be granted[.]" *Cabiri v. Government of the Republic of Ghana,* 165 F.3d 193, 196 (2d Cir.1999). Here, ABS invokes the counterclaim exception provisions of subsections 1607(b) and (c) of the FSIA. The Court will address each exception in turn.

*Section 1607(b)*

Section 1607(b) provides that a foreign state shall not be accorded immunity with respect to any counterclaim "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state[.]" 28 U.S.C.A. § 1607(b) (West 1994). "The FSIA House Report notes that the phrase 'transaction or occurrence' in § 1607 corresponds to the test for compulsory counterclaims in Fed.R.Civ.P. 13(a)...." *Cabiri,* 165 F.3d at 197. In determining whether counterclaims fall within the scope of section 1607(b), courts therefore look for guidance to case law construing the phrase "transaction or occurrence" in Rule 13(a). *Id.* In this Circuit, "the test for determining what constitutes the same transaction or occurrence is whether there exists a logical relationship between the claim and the counterclaim." *Id.* at 197 (internal citation and quotation marks omitted). The Second Circuit has "construed the transaction or occurrence standard liberally," looking to the " 'logical relationship between the claim and the counterclaim [in an attempt] to determine whether the essential facts of the various

claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Id.* (quoting *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979)).

A further Rule 13(a) requirement for compulsory counterclaims is that such a counterclaim be one that a pleader has against the opposing party at the time the pleading is served. Fed.R.Civ.P. 13(a). Although the parties here agree that the logical relationship test should govern the Court's analysis, they disagree as to whether a counterclaim must be mature to satisfy the requirements of 1607(b). Plaintiff urges the Court to construe section 1607(b) as carving out an exception to sovereign immunity only for claims that would be Rule 13(a) compulsory counterclaims, and thus exist at the time the pleading is served. ABS argues that section 1607(b) should not limited to such compulsory counterclaims on the ground that "neither the language of the FSIA nor the legislative history states that 1607(b) counterclaims must be *compulsory,*" by which ABS presumably means *mature,* because ABS does not dispute that counterclaims must arise from the same transaction as the sovereign's claims to fall within the scope of 1607(b). ABS correctly notes that, although section 1607(b) explicitly adopts the "transaction or occurrence" language of Rule 13(a), it does not contain the maturity language present in Rule 13(a). However, Second Circuit authority can be read to suggest that the maturity requirement is nonetheless applicable. The lower court in *Cabiri* found that Congress intended section 1607(b) "to permit the filing of compulsory counterclaims." *Cabiri v. Government of the Republic of Ghana,* 981 F.Supp. 129, 132 (E.D.N.Y.1997), *aff'd in part, rev'd in part, Cabiri v. Government of the Republic of Ghana,* 165 F.3d 193 (2d Cir.1999). In its decision affirming in part and reversing in part the lower court's

determination on the issue of whether the plaintiff's claims arose from the same transaction or occurrence as the foreign sovereign defendant's claim for the purposes of section 1607(b), the Second Circuit implicitly approved the compulsory counterclaim construction of section 1607(b) by noting that the district court had applied the correct standard in its 1607(b) analysis. *Cabiri,* 165 F.3d at 197. The Court need not, however, decide whether section 1607(b) applies only to claims that both satisfy the transaction or occurrence standard and are mature, because ABS' counterclaims fail to satisfy the logical relationship test in ways parallel to the claims dismissed in *Cabiri.*

*Cabiri* arose from an eviction proceeding commenced by the Republic of Ghana against Bawol Cabiri, its former trade representative. Cabiri had enjoyed the use of a house in Connecticut under his employment contract with Ghana. After recalling Cabiri home (where Cabiri alleged he was detained and tortured), Ghana sued in state court to evict his family from the house. *See id.* at 195. Cabiri asserted counterclaims in the eviction proceeding for breach of contract, abuse of trust, fraudulent misrepresentation, false imprisonment, and intentional infliction of emotional distress. These claims were eventually replead in federal court after the eviction proceeding settled. *Id.* The Republic of Ghana moved for dismissal of Cabiri's claims for lack of subject matter jurisdiction. Cabiri contended that the claims fell within certain exceptions to the FSIA's general grant of immunity, including section 1607(b). The district court disagreed and dismissed the claims for lack of subject matter jurisdiction. The Second Circuit affirmed except as to the breach of contract claim, which it found to arise from the same transaction as the eviction proceeding, and thus to fall within

the scope of section 1607(b). *Id.* at 196–199.

The Second Circuit found that the eviction proceeding and Cabiri's breach of contract counterclaim arose from the same transaction because the "core issue in both claims is whether Cabiri's employment was lawfully terminated." *Id.* at 198. As noted above, Cabiri's possession of the house was "an incident of his employment." *Id.* Although Cabiri's abuse of trust and fraudulent misrepresentation claims also were related to Cabiri's employment (Cabiri alleged that Ghana abused the employment relationship by inducing him to return to Ghana under false pretenses), neither claim concerned whether Cabiri's employment contract was lawfully performed or terminated. *Id.* Cabiri's other counterclaims likewise "lacked a sufficient logical relationship to [his] employment contract and its termination." *Id.* at 199.

■ Plaintiff's claims in the instant action concern alleged breaches by ABS of its duty to exercise care in inspecting and classifying the Prestige, namely, whether ABS inspections of the Prestige failed to identify the fatal structural weaknesses that led to the ship's disintegration, and/or whether ABS certified the Prestige for duty for which it was not in fact fit. ABS' counterclaims, however, relate to whether ABS is entitled to indemnification or contribution from Spain for any judgment ABS incurs "anywhere in the world" in connection with Prestige-related litigation against it. Although both sets of claims clearly relate to the Prestige oil spill, the relationship between the "core issues" presented by them is not sufficiently logical for them to arise from the same transaction within the meaning of the statutory exception. The issues presented by ABS' claims involve Spain's duties, if any, to ABS or others in connection with vessels in distress. Spain's claims, by contrast, involve whether ABS deviated from the

proper practices of classification societies in its continuing certification of the Prestige. Those sets of issues are at least as unrelated as the non-contract counterclaims were to the eviction proceeding in *Cabiri.* Moreover, ABS' counterclaims suffer from an even greater deficiency arising from the fact that it seeks indemnification and contribution for judgments it has not yet incurred, in favor of parties not yet identified, on the basis of claims not yet plead. Consequently, the Court cannot even determine on the current record whether or not the claims and potential claims underlying ABS' counterclaims, and thus the counterclaims, are sufficiently logically related to Spain's claims for the purposes of 1607(b) because the issues those counterclaims will present are not yet clear.

ABS relies heavily on *In re Oil Spill by Amoco Cadiz*, 491 F.Supp. 161 (N.D.Ill. 1979), for its argument that its counterclaims do satisfy the logical relationship test. In *Amoco Cadiz*, the court allowed contribution and indemnity counterclaims to be brought by the oil company defendants against France based on France's alleged negligence in containment and cleanup of the oil spill at issue, even though the oil company defendants had not yet paid damages in excess of their fair share of the liability. *Id.* at 165. The court also found that the oil company defendants' counterclaims arose from the same transaction or occurrence as France's claims, and thus fell within the 1607(b) exception to foreign sovereign immunity. *Id.* at 168. The key distinction between *Amoco Cadiz* and the instant action is that the *Amoco Cadiz* court could determine whether the counterclaims and France's claims arose from the same transaction because all of the parties and claims at issue were already present in the litigation, even if liability had yet to fixed.

ABS also cites various cases in which courts allowed contribution claims to be plead as Rule 13(a) counterclaims before they had technically ripened. *See Index Fund, Inc. v. Hagopian,* 91 F.R.D. 599 (S.D.N.Y.1981); *Lynch v. Sperry Rand Corp.,* 62 F.R.D. 78 (S.D.N.Y.1973); *Gilbert v. General Electric Co.,* 59 F.R.D. 267 (E.D.Va.1973); *Atlantic Aviation Corp. v. Estate of Costas,* 332 F.Supp. 1002 (E.D.N.Y.1971). As with *Amoco Cadiz,* in all of these cases the issue presented was whether a party can bring a contribution or indemnity claim based on liability that would arise, if at all, in that very action as among parties to the action. ABS' contribution counterclaim cases therefore do not address the situation here, where the parties as to whose claims ABS seeks indemnification (other than Spain itself) are not parties to this action. Indeed, they are largely unknown. ABS does identify the plaintiffs in two pending suits, but ABS' claims are not confined to those parties or suits. Moreover, the nature of the liability for which ABS seeks contribution is not delineated: it could be liability on theories like those asserted by Spain in this action, but ABS' counterclaims are not limited to such theories. Accordingly, the Court finds that ABS has failed to show that its counterclaims are so logically connected to Spain's claims that considerations of judicial economy and fairness dictate that these claims be resolved in one action, and thus ABS has failed to meet its burden of showing that its counterclaims fall within the scope of section 1607(b).

*Section 1607(c)*

Section 1607(c) provides that immunity does not exist with respect to any counterclaim "to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state." 28 U.S.C.A. § 1607(c) (West 1994). The FSIA House Report notes that "notwithstanding that the foreign state may be immune under subsections (a) and (b), the foreign state nevertheless would not be immune from a setoff. Subsection (c) codifies the rule enunciated in *National [City] Bank v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955)." [1] H.R. REP. 94–1487, at 23, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6622. *See also* 14A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 3662, at 229 (2d ed.) ("1607(c) provides that [a] foreign state will not be immune from a claim in the nature of a setoff.").

■ ABS' counterclaims are not limited to pleading a right to set-off, and thus do not fall within the scope of 1607(c). Furthermore, to the extent ABS seeks declaratory relief, it seeks relief different in kind from that sought by Spain, and therefore fails to meet the requirements of 1607(c) on that basis as well. Accordingly, Defendant has failed to show that its counterclaims fall within the scope of section 1607(c).

Defendant has failed to show that the FSIA does not deprive the Court of subject matter jurisdiction of its counterclaims. Accordingly, ABS' counterclaims must be dismissed pursuant to Rule 12(b)(1). In light of its disposition of the subject matter jurisdiction prong of Plaintiff's motion, the Court declines to address Plaintiff's Rule 12(b)(6) arguments.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss is granted to the extent that Defendant's counterclaims are dis-

---

1. In *National City Bank,* the defendant bank was allowed to assert a counterclaim based on defaulted treasury notes in the form of a setoff against the sovereign-plaintiff's recovery in its action to recover a deposit from the bank. *National City Bank v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955).

missed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

SO ORDERED.