Owen MESSINGER et al.

v.

UNITED CANSO OIL AND GAS LTD. et al.

Civ. No. H–77–301.

United States District Court, D. Connecticut.

March 24, 1980.

## RULINGS ON MOTIONS FOR DETERMINATION OF FOREIGN LAW AND FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

This is a shareholders' derivative suit brought on behalf of United Canso Oil and Gas Ltd. ("Canso") against Canso's seven directors ("the individual defendants") and the Catawba Corporation ("Catawba"), a Delaware corporation with its principal place of business in Connecticut. The defendants have moved, pursuant to Fed.R. Civ.P. 44.1,[1] "for a determination of the law of Canada with respect to the following issue: Is a demand upon majority shareholders a condition precedent to commencement of a shareholders' derivative suit?" If under the circumstances of this case that question were answered in the affirmative, the defendants would be entitled to summary judgment[2] since the plaintiffs concede that no such demand was ever made.

### The Facts

On a motion for summary judgment, the pleadings, depositions, admissions, affidavits, and exhibits, together with the inferences drawn therefrom, "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).[3] For purposes of these motions, a trier might find the following facts.

Canso, an oil and gas exploration and development company, entered into a man-

James O'Connor Shea, New Haven, Conn., Sidney B. Silverman and Joan T. Harnes, Silverman & Harnes, New York City, for plaintiffs.

Irving R. M. Panzer, Washington, D. C., William R. Moller, Moller & Horton, Hartford, Conn., Gary A. MacMillan and James R. Hawkins, II, Cummings & Lockwood, Stamford, Conn., J. Daniel Mahoney and Eric W. Bruenner, Joseph A. McManus, Coudert Bros., New York City, James D. O'Connor, Hartford, Conn., for defendants.

1. Fed.R.Civ.P. 44.1 provides:
   "A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law."
   As this is a diversity case, 28 U.S.C. § 1332(a)(3) (1976), the federal court must apply the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Electrical Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). A Connecticut court in

this case would undoubtedly apply the law of the place of incorporation. *Steinberg v. Hardy*, 90 F.Supp. 167, 169 (D.Conn.1950); *Union & New Haven Trust Co. v. Watrous*, 109 Conn. 268, 276, 146 A. 727, 730 (1929). Canso being a Canadian corporation, the case must be decided under Canadian law.

2. The defendants have also moved for summary judgment under Fed.R.Civ.P. 56.

3. The plaintiffs' verified amended complaint may be treated as an affidavit "to the extent that it meets the requirements for affidavits set out in Rule 56(e)." *Runnels v. Rosendale*, 499 F.2d 733, 734 n.1 (9th Cir. 1974).

agement agreement with Catawba, pursuant to which Catawba was to receive a 1/64th gross overriding royalty on certain oil produced by Canso.[4] Catawba, in turn, had assigned the royalty rights to its shareholders,[5] among whom were at least four of Canso's seven directors—defendants John W. Buckley, Priscilla L. Buckley, Benjamin W. Heath, and C. Dean Reasoner. In this way, funds paid by Canso to Catawba in the form of a royalty would eventually find their way into the pockets of a majority of Canso's directors.

In January 1975, Canso's directors, including the four defendants named above, resolved to sell the company's wholly-owned British subsidiary, which itself owned an interest in oil and gas fields in the North and Irish Seas. A German consortium purchased the subsidiary on March 5, 1975, paying some $50 million for the mineral interests. That sum was agreed upon after arm's-length negotiation and approximated the then present-day value of the subsidiary's proven, probable, and possible oil and gas reserves.

Meanwhile, the question had arisen whether Canso would be liable to pay Catawba a royalty as a result of the proposed sale. Two Canso directors, defendants Albert E. Barton and Austin G. E. Taylor, were appointed by the board of directors to seek outside advice and counsel on this matter. Barton and Taylor were chosen for this task ostensibly because they "had no interest in the royalty." Affidavit of John W. Buckley at 6 (Sept. 19, 1977) [hereinafter Buckley Affidavit]. It seems, however, that Barton and Taylor were not entirely disinterested in the outcome of their investigation either. Barton has served the Buckley family as a business adviser for some 30 years, including a lengthy period as agent for the trustees of two Buckley family trusts. Deposition of Defendant Albert H. Barton at 8–16 (Jan. 4, 1980). Taylor was a brother-in-law of William F. Buckley, Jr., the latter being a Catawba shareholder who would be entitled to ten per cent of any royalty paid by Canso. Deposition of Defendant John W. Buckley at 16 (Nov. 12, 1979).

Barton and Taylor undertook to determine whether the royalty should be paid and sought the advice of legal counsel for this purpose. It seems clear, however, that the interested directors had previously told Barton and Taylor what kind of legal advice they wanted. An April 28, 1975 letter from then-director Roland J. Richardson to John W. Buckley states:

> "As a result of the two Directors' meetings in January and March, it was my understanding that:—
>
> "1) Taylor and Barton were to get an outside legal opinion that the royalty did in fact attach to the U.K. subsidiary. This was subsequently obtained and was affirmative."

Specifically, the favorable opinion advised that "if, through no fault of its own,[6] Catawba is unable to receive the consideration for its services which it appears from the general intention expressed in the Agreement it was to receive, it is entitled to be fairly compensated for the loss it has suffered." Letter from Lawson, Lundell, Lawson & McIntosh to A. H. Barton and Austin G. E. Taylor at 4 (Mar. 4, 1975).

---

**4.** The terms of the management agreement are not a part of the record, making it impossible to know precisely what services Catawba was to perform in return for its royalty. In general, however, it seems that "Catawba agreed to provide technical assistance and administrative and other services to United Canso in its business of exploring for and producing oil, gas and other minerals." Letter from Lawson, Lundell, Lawson & McIntosh to A. H. Barton and Austin G. E. Taylor at 1 (Mar. 4, 1975).

**5.** Eighty per cent of the common stock of Catawba is owned, in equal parts, by the eight surviving children of William F. Buckley, Sr.

The remaining twenty per cent is owned by the families of two deceased daughters of William F. Buckley, Sr.

**6.** Catawba allegedly dominates and controls Canso's business programs, policies, and affairs by virtue of the management agreement between the two companies. Amended Cplt. ¶ 4(c). In addition, three Canso directors were also directors of Catawba. Amended Answer of Canso ¶ 4(c). It is therefore questionable whether Catawba "suffered" the sale of Canso's British subsidiary "through no fault of its own."

Acting on this and additional legal advice, Taylor and Barton engaged the services of a petroleum engineering firm "to determine the present value of the ⅟₆₄th gross overriding royalty" on the British subsidiary's oil reserves. Buckley Affidavit at 7. One might question why this additional step was necessary, as indeed the plaintiffs do. Having contemporaneously sold these reserves for $50 million in an arm's-length transaction, Canso could simply have computed the ⅟₆₄th royalty based on that sum, which would have resulted in a payment to Catawba of more than $780,000. Nowhere do the defendants adequately explain the necessity for this second evaluation, although it was based on data that Canso itself supplied. Evaluation of the Catawba Royalty on Blocks 211/18, 106/28 in the North Sea, at 5 (May 1, 1975); *see* Letter from R. J. Richardson to John W. Buckley at 1 (Apr. 28, 1975) [hereinafter Richardson Letter]. Suffice it to say that the engineers calculated the value of the subsidiary's reserves at over $200 million— more than four times the actual sale price of the property. This yielded a royalty of $3,196,000.

It should be observed that the interested directors were not entirely careful to avoid all contact with Taylor and Barton on this matter. Roland J. Richardson, for example, who apparently was an interested director, had a telephone conversation with Taylor in late April of 1975 in which Richardson "volunteered" his views on various issues affecting the size of the royalty. Richardson Letter at 2. And on May 27, 1975, Barton and Taylor delivered the legal opinions and engineers' report they had obtained to a meeting of Canso's board of directors, at which all the directors were present. Bar-

ton and Taylor "recommended" that an offer of $3,196,000 be made to the owners of the royalty interest, and a resolution to that effect was approved. Buckley Affidavit at 7–8.

The plaintiffs allege, and on this motion there exist sufficient facts to establish, that the defendants conspired with one another by "determin[ing] upon a plan and scheme to defraud United Canso and its shareholders." Amended Cplt. ¶ 9. Indeed, what happened at the May 27 Canso directors' meeting seems at least questionable, a majority of Canso directors having voted to "offer" themselves an extraordinary royalty. Not surprisingly, "[t]he offer was accepted by all royalty owners." Buckley Affidavit at 8.

The plaintiffs brought suit to recover the amount actually paid and also seek $1 million in punitive damages, costs, and attorneys' fees. They allege that "[t]he payment to Catawba of $3,196,000 was unlawful, illegal, excessive and fraudulent. Such payment represented a waste and spoliation of the assets of United Canso for the benefit of Catawba and the Buckley family." Amended Cplt. ¶ 12. Attempting to avoid a trial on these charges, the defendants contend that they are entitled to summary judgment, based on the plaintiffs' conceded failure to make demand on Canso's shareholders. I now turn to that issue, which must be decided under Canadian law. *See* note 1 *supra*.

*Evolution of Canadian Law on Shareholders' Derivative Actions*

For well over a century, the English and Canadian courts [7] have struggled with the notion that a minority shareholder might sue, on behalf of himself and other share-

---

7. The rulings of the courts of England have precedential and persuasive value in the courts of Canada, except to the extent that they are overruled or rejected by the Supreme Court of Canada. Prior to 1949, appeals from provincial appellate courts could be taken directly to the Judicial Committee of the Privy Council—essentially, the same group of judges as the House of Lords in London. This accounts for the great respect still accorded English decisions by the courts of Canada.

The Canadian judicial system bears some resemblance to that of the State of New York. The Supreme Court in most of the provinces is divided into trial and appellate divisions. The highest court of each province is the Court of Appeal. The Supreme Court of Canada serves as the final appellate tribunal for the country, and its decisions bind all lower courts.

holders, to vindicate a wrong done to the corporation. The well-spring of judicial learning on the problem is *Foss v. Harbottle*, 67 Eng.Rep. 189 (Ch.1843), in which two shareholders charged their corporation's directors "with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted." *Id.* at 190. Vice-Chancellor Wigram posed the issue in the case as follows:

"[T]he only question can be whether the facts alleged in this case justify a departure from the rule which, *prima facie*, would require that the corporation should sue in its own name and in its corporate character, or in the name of someone whom the law has appointed to be its representative."

*Id.* at 202.

In resolving this question, Sir Wigram did not reject entirely the concept that an individual shareholder could sue for injury to the corporation, but he imposed a heavy burden of justification on the complaining party:

"In order then that this suit may be sustained it must be shewn either that there is no such power as I have supposed remaining in the proprietors [that is, the power of the shareholders to control the affairs of the company], or, at least, that all means have been resorted to and found ineffectual to set that body in motion."

*Id.* at 204. The rationale for the rule seemed obvious to the Vice-Chancellor: since a majority could bind a reluctant minority by ratifying the acts complained of, the dissatisfied few should be required to exhaust their intra-corporate remedies before suing on behalf of the corporation and its shareholders. *See id.* at 203–04.

While the principle of *Foss v. Harbottle* was soon followed in Canada, *Hamilton v. Desjardins Canal Co.*, 1 Grant 1 (Upper Can.Ch.1849), its inadequacies were quickly recognized, too. The *Hamilton* court held that

"in those cases where, owing to circumstances, the company's name cannot be used, yet, plaintiffs assuming to sue in the form used in this bill, must, in order to entitle themselves to adopt such a course, shew that the majority of corporators concur—*except, indeed, where the act complained of is plainly illegal, and so incapable of confirmation.*

*Id.* at 19 (emphasis added). A long process by which exceptions were slowly carved out of the general rule was thus begun by the *Hamilton* court.

By the turn of the century, the illegality exception recognized in *Hamilton* found company in cases of fraud. The Privy Council, in *Burland v. Earle*, [1902] A.C. 83 (P.C.1901) (Ont.), explained that "[t]he cases in which the minority can maintain [a derivative] action are . . . confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company." *Id.* at 93. In order to avoid the requirement that demand on shareholders be made first, however, the plaintiff would have to demonstrate that "the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company." *Id.*[8]

Two further exceptions to the general rule, not pertinent to the instant case,[9] were developed by mid-century, provoking the English Court of Appeal to remark that these modifications to *Foss v. Harbottle*, and particularly the fraud exception, "show

---

**8.** *Burland* reached the Privy Council from the Ontario courts, and thus found acceptance in other provinces, as well. *Mason v. Livingstone*, [1929] 1 D.L.R. 608 (Alta.A.D.); *Rose v. British Columbia Refining Co.*, 16 B.C. 215 (1911).

**9.** One new exception permitted an individual shareholder to sue if the matter about which he complained was one that could only be done by

some special majority (*e. g.*, a two-thirds vote), rather than a simple majority. *Edwards v. Halliwell*, [1950] All E.R. 1064, 1067 (C.A.) (Jenkins, L. J.). Individual shareholders could also sue to vindicate their personal rights as, for instance, in the case where management tried to prevent the shareholder from voting at an annual meeting. *See id.*

. . . that the rule is not an inflexible rule and it will be relaxed where necessary in the interests of justice." *Edwards v. Halliwell*, [1950] All E.R. 1064, 1067 (C.A.) (Jenkins, L. J.). Moreover, the rationales for the various exceptions were crystallized, and each was held to rest on a different foundation. An allegation of ultra vires or illegal action would support a minority shareholder's suit *without* demand being made on the shareholders, since even a majority was powerless to ratify the challenged act. *Id.* In the case of fraud, however, demand would be excused only if "the wrongdoers are themselves in control of the company," the theory being that a complainant should exhaust his internal corporate remedies unless such an effort would be idle or futile. *See id.; Wheeler v. Annesley*, 11 D.L.R.2d 573, 576 (B.C.S.C. 1957).

If any doubts persisted that *Foss v. Harbottle* and its attendant exceptions had been incorporated into the law of Canada, they were resolved in *Burrows v. Becker*, 70 D.L.R.2d 433 (Can.1968). The Supreme Court of Canada noted there that "the rule is a salutary rule and not one of mere technicality. . . . A group of shareholders cannot complain of acts which are valid if done by the majority of the shareholders or are capable of being confirmed by the majority." *Id.* at 440–41. Since the " 'plaintiffs [had] not shown that any attempt to have the company bring this action in its own name would have been futile,' " *id.* at 442, *quoting* 63 D.L.R.2d 100, 161 (B.C.1967), the Supreme Court held for the defendants.

The Canadian common law in this area has recently been subjected to legislative scrutiny and amendment, resulting in the enactment of several statutes that, for the first time, provide legislative authority for the maintenance of a derivative action. One such statute's broad wording permits a complainant to "apply to a court for leave to bring an action in the name and on behalf of a corporation or any of its subsidiaries . . . ." Canada Business Corporations Act, 1974–75 Can.Stat., ch. 33, § 232(1). Only three conditions appear necessary for court approval:

"*(a)* the complainant has given reasonable notice to the directors of the corporation or its subsidiary of his intention to apply to the court under subsection (1) if the directors of the corporation or its subsidiary do not bring . . . the action;

"*(b)* the complainant is acting in good faith; and

"*(c)* it appears to be in the interests of the corporation or its subsidiary that the action be brought . . . ."

*Id.* § 232(2); *see* British Columbia Companies Act, S.B.C.1973, ch. 18, § 222; Ontario Business Corporations Act, R.S.O.1970, ch. 53, § 99. The new statutes are not directly applicable to the instant case,[10] but ought not be ignored in determining the current state of Canadian law on this subject.

### Effect of Recent Statutory Enactments

In light of the recent statutory enactments governing derivative suits, one must question the continued vitality of the rule in *Foss v. Harbottle*. As noted above, the Canada Business Corporations Act, 1974–75 Can.Stat., ch. 33, § 232, provides the first federal statutory authority and guidance for the conduct of such actions. Section 232 of the Act bears a close resemblance to section 99 of the Ontario statute, and both are modeled on Rule 23.1 of our own Federal Rules of Civil Procedure. Beck, *The Shareholders' Derivative Action*, 52 Can.B. Rev. 159, 163–64 (1974) [hereinafter Beck]. Although neither statute, by its own terms, is directly applicable to this case, *see* note 10 *supra*, both reflect a distinct change from the old rule that the Canadian courts would be hard-pressed to ignore. Indeed,

---

10. The events giving rise to this lawsuit began nearly three weeks before the federal statute was passed, although the alleged conspiracy was consummated some months afterward. Not until October 25, 1979 did Canso elect to continue its existence under and become subject to the federal Act, and this case therefore continues to be governed by the law applicable at the time the action was commenced—June 22, 1977.

the defendants' lengthy submissions fail to cite a single case applying the rule in *Foss v. Harbottle* since passage of the federal statute; nearly all of their cases were decided 30 years ago or more.

The drafters of the new statutes obviously intended "to free the minority from the tangles of the *rule* [in *Foss v. Harbottle*] and not [to be] constrained by the traditional exceptions." Beck, *supra*, at 198. Those who recommended Ontario's Act, for instance, saw it as a " 'remedy . . . which can and should be adapted to Ontario law and practice to serve as an effective procedure whereby corporate wrongs can be put right.' " *Id., quoting* Interim Report of the Select Committee on Company Law 63 (Ont.1967). The federal reform group, more fervent in its criticism of *Foss v. Harbottle*, noted:

> " 'At one stroke this provision [the current section 232] circumvents most of the procedural barriers that surround the present right to bring a derivative action . . . [w]e [*sic*] have relegated the rule to legal limbo without compunction, convinced that the alternative system recommended is preferable to the uncertainties—and obvious injustices—engendered by that infamous doctrine.' "

*Id., quoting* 1 Proposals for a New Business Corporations Law for Canada 161 (Can. 1971). And as Professor Beck points out, "most importantly, the federal Act [in the current section 235(2)] clearly directs the court to look to the merits of each case regardless of the fact or possibility of ratification." *Id.*

The Canadian judiciary's traditional lack of hospitality toward shareholder litigation stemmed primarily from the view that " '[i]t is not the business of the court to manage the affairs of the company. That is for the shareholders and the directors.' " *Id.* at 163, *quoting Shuttlesworth v. Cox Bros. & Co.*, [1927] 2 K.B. 9, 23 (Scrutton, L. J.).

But this public policy foundation for application of the rule in *Foss v. Harbottle* has now been swept away by the legislature's recognition that a more accommodating—and more just—policy should prevail. One of the defendants' distinguished experts, Professor Jacob Ziegel, nevertheless contends:

> "Although statutes may be an accepted source of law in the United States, they are not ordinarily so in Canada and, in my view, it is highly speculative whether a Canadian court would treat the new statutory provisions in this manner. I am not aware of any decision in which it has done so . . . . ."

Ziegel Memorandum at 12. This court is unwilling to assume, however, that the Canadian judiciary would pay no heed to the thoroughly considered action of the legislature in enacting a comprehensive reform of its corporation laws that better accords with modern realities.[11] "[C]ourts do not always wait for legislation to find a judicial doctrine outmoded. . . . 'A steady legislative trend, presumably manifesting a strong social policy, properly makes demands on the judicial process.' " *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 211, 76 S.Ct. 273, 281, 100 L.Ed. 199 (1956) (Frankfurter, J., concurring), *quoting National City Bank of New York v. Republic of China*, 348 U.S. 356, 360, 75 S.Ct. 423, 426,

---

11. One of the cases cited by Professor Ziegel himself hints at the very judicial deference to legislative policy statements of which he seems unaware.

In *Goldex Mines v. Revill*, 38 D.L.R.3d 513 (Ont.H.C.1973), *aff'd in part and rev'd in part on other grounds*, 54 D.L.R.3d 672 (Ont.1974) (per curiam), the question arose whether "the holding of an annual meeting and election of directors after the sending out of a misleading information circular by the directors" constituted a breach of their duty to other shareholders. *Id.* at 679. Citing the holding in another case that such conduct was a breach of the directors' fiduciary duty to the company, the court went on to hold that the directors' duty to the shareholders was violated, as well. The court reasoned, "*With the legislative trend obviously towards greater protection of shareholders* by seeing that they receive certain information, truthfully and fairly presented, we see no difficulty in holding that shareholders are injured if they do not receive it, apart altogether from any breach of duty owed to the company itself." *Id.* at 680 (emphasis added).

99 L.Ed. 389 (1955). Moreover, the Supreme Court of Canada has recently acknowledged that modern realities dictate "an updating" of old principles of fiduciary duty. *Canadian Aero Services Ltd. v. O'Malley*, 40 D.L.R.3d 371, 386 (Can.1973) [hereinafter *Canaero v. O'Malley*]. One must assume that the same prospective analysis would extend to the question presented by the instant case.

### Analysis Under the Traditional Rule

■ Having decided that the recent corporation statutes should be taken into account in determining the applicability of the demand requirement, I turn now to consideration of the rule in *Foss v. Harbottle*. As noted in *Garvie v. Axmith*, [1962] Ont. 65, 78 (H.C.), demand on shareholders would have been excused where the act complained of was "*ultra vires* of a company or illegal." *See also Edwards v. Halliwell, supra*, at 1067. Such illegality may consist of an act contrary to statute, to the corporate by-laws, or to the directors' fiduciary obligations. *See D'Amore v. McDonald*, 32 D.L.R.3d 543, 560–63 (Ont.H.C.), *aff'd*, 40 D.L.R.3d 354 (Ont.1973). In the instant case, for several reasons, there is a strong scent of the latter.[12]

First, as previously indicated, the upward revaluation of the royalty payable to Catawba and the legal opinions in support thereof may well have resulted from a conspiracy between some or all of the defendants. Such a conspiracy, wholly apart from the fraudulent nature of its objectives, would certainly constitute illegal self-dealing and disloyalty of the highest proportions. *See Canaero v. O'Malley, supra*, at 382. Second, the participation of the interested directors in a board decision to make an "offer" to the royalty owners (while at the same time such directors held a majority of votes on the board) seems a clear breach of the duty to avoid conflicting interests.[13] *See Transvaal Lands Co. v. New Belgium (Transvaal) Land and Development Co.*, [1914] Ch. 488, 503; *North-West Transportation Co. v. Beatty*, 12 A.C. 589, 593–94 (P.C.1887) (Can.). Third, the management agreement itself may be void as against public policy, and hence illegal, because it fosters a dangerous conflict of interests among a majority of Canso's directors and confers a benefit on such directors personally at the expense of their corporation. *See Re Millar*, [1938] 1 D.L.R. 65, 69–70 (Can.).[14] Finally, even assuming

---

**12.** Demand was excused in the case of illegal acts because shareholders were powerless to ratify them. That rationale is fully applicable to this case, since a breach of fiduciary duty cannot be ratified if "oppressive towards those shareholders who oppose it." *North-West Transportation Co. v. Beatty*, 12 A.C. 589, 593–94 (P.C.1887) (Can.).

**13.** Under section 98(5) of the Canada Corporations Act, 1970 Can.Rev.Stat., ch. C–32, by which Canso was governed at the time, an interested director was shielded from liability for any profits realized under a contract with his company, but only if he "has made a declaration of his interest in [the] contract . . . *and has not voted in respect of such contract* . . . ." (Emphasis added). The record contains no indication of whether these directors declared their interests and refrained from voting when the original management agreement with Catawba was adopted; in any event, the statute was phrased broadly enough to impose on them a continuing obligation to refrain from voting on questions arising under that contract.

**14.** "[T]here are at least two conditions which must be fulfilled to justify a refusal by the

Courts on grounds of public policy to give effect to a rule of law according to its proper application in the usual course in respect of a disposition of property. First, we respectfully concur in the judgment of Lord Thankerton in *Fender v. Mildmay* (at p. 414):—

'Generally, it may be stated that such prohibition is imposed in the interest of the safety of the state, or the economic or social well-being of the state and its people as a whole. It is therefore necessary, when the enforcement of a contract is challenged, to ascertain the existence and exact limits of the principle of public policy contended for, and then to consider whether the particular contract falls within those limits.'

"Secondly, we take the liberty of adopting the words of Lord Atkin in his judgment in the same case (at p. 407),

'. . . it (referring to Lord Halsbury's judgment in *Janson's* case) fortifies the serious warning . . . that the doctrine should be invoked only in clear cases, in which the harm to the public is substantially incontestable, and does not depend upon the idiosyncratic inferences of a few judicial minds. I think that this should be regarded as the true guide.'"

the agreement was not illegal, the royalty owners were entitled only to a ⅟₆₄th gross overriding royalty on the fair market value of oil produced by Canso. There is a strong suggestion here that they received more than they bargained for.[15] If so, a breach of fiduciary duty would be clear, for it is well-established that directors cannot make a present to themselves or others of corporate funds or other assets.

With respect to fiduciary obligations of a somewhat different sort—that is, the duty of directors not to seize corporate opportunities for themselves—the Supreme Court of Canada has recently observed:

> "The general standards of loyalty, good faith and avoidance of a conflict of duty and self-interest to which the conduct of a director or senior officer must conform, *must be tested in each case by many factors which it would be reckless to attempt to enumerate exhaustively.* Among them are the factor of position or office held, the nature of the corporate opportunity, its ripeness, its specificness and the director's or managerial officer's relation to it, the amount of knowledge possessed, the circumstances in which it was obtained and whether it was special or, indeed, even private."

*Canaero v. O'Malley, supra,* at 391 (emphasis added). The *Canaero* Court was essentially saying that the question whether a fiduciary duty has been breached is one of fact and requires a case-by-case analysis in light of all the surrounding circumstances.

■ In the present case, that determination must await a trial on the merits. Resolution of these issues will turn largely on questions of good faith or intent, which should not be resolved on summary judgment. 6 *Moore's Federal Practice* ¶ 56.-17[41.–1], at 56–930. Similarly, "[t]he existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide." *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 176, 90 S.Ct. 1598, 1618, 26 L.Ed.2d 142 (1970). If such breaches of fiduciary duty on the part of Canso's directors were proved, that conduct would have been illegal, and demand on the shareholders would be excused. The defendants are asking this court to grant summary judgment for failure to make demand before the court can ascertain the facts that might excuse it. Even under the rule in *Foss v. Harbottle,* upon which the defendants rely so heavily, the illegality exception prevents them from prevailing here.[16]

Re *Millar, supra,* at 69–70. The inference must be drawn, on this motion for summary judgment, that the royalty called for by the management agreement was the result of intentional self-dealing. I am confident that if this inference were confirmed at trial, a Canadian court would find the agreement void as against public policy under the principles of *Millar.* Cf. 7A *Fletcher Cyclopedia of the Law of Private Corporations* § 3590, at 210 (rev. perm. ed. 1978) (American law).

**15.** The analogous American case of *Richardson v. Blue Grass Mining Co.,* 29 F.Supp. 658 (E.D. Ky.1939), *aff'd per curiam,* 127 F.2d 291 (6th Cir. 1942), put it well:

> "It is not within the power of officers or agents of a corporation to thus give away corporate assets . . . [i]n the absence of a showing of formal action by stockholders authorizing such payment *and a further showing of a valid contract providing for such payment upon a basis having a proper relation to the value of the service for which it is given* . . . ."

*Id.* at 668 (emphasis added). A Canadian court would unquestionably approve the same for-

mulation. *See D'Amore v. McDonald, supra,* at 562.

Even where the amounts paid are duly authorized and calculated on a proper basis, the United States Supreme Court has held that such payments may "become so large as to warrant investigation in equity in the interest of the company." *Rogers v. Hill,* 289 U.S. 582, 591, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933). The presumptions of regularity and continuity "cannot, against the protest of a shareholder, be used to justify payments of sums . . . so large as in substance and effect to amount to spoliation or waste of corporate property." *Id.*

**16.** The plaintiffs also invoke the ultra vires and fraud exceptions in support of their contention that demand would be excused by a Canadian court. *See* pp. 8–10 *supra.* The ultra vires claim cannot stand; Canso is a letters patent corporation, and "the doctrine of ultra vires has no real application" to such a company "in the absence of statutory restriction added to what is written in the [company] charter." *Bonanza Creek Gold Mining Co. v. The King,* [1916] 1 A.C. 566, 584 (P.C.) (Can.).

In this ruling, I have made an unusually extensive foray into the evidence submitted by the parties for the purpose of demonstrating that the plaintiffs' contentions are neither unfounded nor *de minimis*. The substantive bases for requiring shareholder approval are not present here. This is not a case where the costs of litigation to the corporation outweigh any potential recovery. *Cf. Burks v. Lasker*, 441 U.S. 471, 485, 99 S.Ct. 1831, 1840, 60 L.Ed.2d 404 (1979) (authority of independent directors to discontinue derivative suits). Nor would a judgment for the plaintiffs " 'overly disrupt the commercial relation[s] of the corporation,' " such as by damaging its business reputation. *Cramer v. General Tel. & Elec. Corp.*, 582 F.2d 259, 275 (3d Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979), *quoting* Note, *The Demand and Standing Requirements in Stockholder Derivative Actions*, 44 U.Chi.L.Rev. 168, 196 (1976). Viewing these factors against the backdrop of recent statutory authorizations for the bringing of derivative actions, as well as the appearance of illegality in the actions of the individual defendants, I predict that the Canadian courts, if directly confronted with this issue, would hold that demand on Canso's shareholders was excused.[17]

### Appropriate Court for Resolution

Professor Ziegel protests nonetheless that even if a Canadian court excused demand by reference to the new statutes, "it would not assist the plaintiff . . . because section 232 of the Canada Business Corporations Act . . . provides, inter alia, that no derivative action may be commenced without leave of the court." Ziegel Memorandum at 12. This approval provision obviously seeks to protect defendants against strike suits and insure that any actions actually commenced have a reasonable foundation in fact and in law. Although the term "court," as defined in section 2 of the Act, includes only Canadian courts, the particular device by which plaintiffs obtain leave to file suit is surely a procedural mechanism that this court is not obligated to employ.[18] *Hanna v. Plumer*, 380 U.S. 460, 466–69, 85 S.Ct. 1136, 1141–42, 14 L.Ed.2d 8 (1965); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–79, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). I have noted above the factors which demonstrate that prosecution of the instant case will serve the interests of the corporation and that the plaintiffs are acting in good faith. *See* Canada Business Corporations Act, 1974–75 Can.Stat., ch. 33, § 232(2)(b), (c). Even if the defendants' objections are regarded as going to

The fraud exception requires that "the wrongdoers [be] themselves in control of the company." *Garvie v. Axmith, supra*, at 78. The parties are in dispute over the meaning of "control" in this context, and the issue is not susceptible of simple resolution. Having decided these motions on alternative grounds, I need not address this difficult question.

17. This court must decide the present case as it believes the highest court of Canada would, "taking into account not merely the generalizations and the dicta in cases from years past but also trends in modern legal thought which we think would be accepted by the Supreme Court of [Canada] today." *Graves v. Associated Transport, Inc.*, 344 F.2d 894, 896 (4th Cir. 1965).

Judge Magruder's analogous discussion in *Mason v. American Emery Wheel Works*, 241 F.2d 906 (1st Cir. 1957), in which a question of Mississippi law was at issue, is pertinent here:

"Of course, it is not necessary that a case be explicitly overruled in order to lose its persuasive force as an indication of what the law is. A decision may become so over-

loaded with illogical exceptions that by erosion of time it may lose its persuasive or binding force even in the inferior courts of the same jurisdiction."
*Id.* at 909.

18. In *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the Supreme Court considered the applicability in federal court of a New Jersey statute that made "a stockholder who institutes a derivative action liable for the expense to which he puts the corporation and other defendants, if he does not make good his claims." *Id.* at 555, 69 S.Ct. at 1230. The Court held the statute to be substantive in nature, and thus fully applicable under *Erie* principles, because "it create[d] a new liability where none existed before." *Id.* at 555–56, 69 S.Ct. at 1230. By contrast, the Canadian statute requiring leave of the court before a derivative action can be filed creates no new liabilities, but only a new procedural mechanism for enforcing pre-existing ones.

**798**

interests that they consider substantive, rather than to the mere procedural propriety of this suit, those objections are adequately met by the foregoing determination. Indeed, a court's analysis focuses more precisely and operates more efficiently with respect to those rights than the process required to secure shareholder approval.

*Conclusion*

Inasmuch as Canadian law would excuse demand if this case had been brought in the Canadian courts, and this court has determined that a reasonable basis for suit exists, the defendants' motion for summary judgment accordingly must be denied, and it is

SO ORDERED.